# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-11135

United States Court of Appeals
Fifth Circuit

**FILED**

August 10, 2017

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

JITEN JAY NANDA; ATUL NANDA,

Defendants - Appellants

Appeals from the United States District Court
for the Northern District of Texas

Before STEWART, Chief Judge, and JONES and CLEMENT, Circuit Judges.
EDITH BROWN CLEMENT, Circuit Judge:

Two brothers, Atul and Jiten "Jay" Nanda (together, "the Nandas"), were indicted, tried jointly by jury, and convicted of various charges stemming from a conspiracy to fraudulently procure H-1B visas. The Nandas jointly appeal their convictions and sentences, raising a number of issues. Because we conclude that the Nandas have not established any reversible error, we AFFIRM their respective convictions and sentences.

I

The Nandas owned and operated Dibon Solutions ("Dibon"), an information technology consulting company based in Texas. Dibon was essentially a staffing company that recruited primarily Indian nationals with

No. 16-11135

computer expertise to come to the United States and work for Dibon to fulfill the computer needs of Dibon's clients. Dibon employed about 200 consultants, most of whom were in the United States on H-1B visas.

The H-1B visa program is designed to allow businesses in the United States to temporarily employ foreign workers with specialized expertise on American soil in order to fulfill specific needs of the employer. To obtain an H-1B visa, an employer must first obtain approval from the U.S. Department of Labor ("DoL") by filing a Labor Condition Application ("LCA"). The LCA requires an employer to represent that it intends to employ a particular foreign worker for a specific position for a given period of time. The employer must also state the rate of pay, the work location, and whether the given position is full-time. The employer further promises to pay all fees arising out of the visa application process, and to pay workers for any non-productive time once they have procured a visa. After approval from the DoL, the employer must then file a Petition for a Nonimmigrant Worker ("I-129") with U.S. Citizenship and Immigration Services ("CIS"). The I-129 requires much of the same information as the LCA, as well as further biographical information regarding the specific prospective visa applicant.

After CIS approves the petition, the worker can apply for an H-1B visa at a U.S. consulate or embassy in her home country. Once she obtains the visa, the worker possesses lawful nonimmigrant status and may reside in the United States and work for the sponsoring employer until either the visa expires or her employment with the sponsoring employer is terminated. The employer is required to begin paying the visa holder once she enters into employment or within 30 days of her admission to the United States, whichever is sooner. If the worker's employment is terminated before her visa expires, the employer must notify CIS and pay for her return to her home country.

No. 16-11135

The representations that the sponsoring employer makes on the LCA and I-129—that it already has a specific open position for the visa applicant, that it will pay all visa fees, that it will pay the employee within 30 days of admission to the U.S. regardless of employment, etc.—are designed in part to prevent employers from fraudulently taking advantage of the H-1B system by engaging in a scheme called "benching." Benching occurs when an unscrupulous employer uses H-1B visas to recruit foreign workers not to fill a specific position at the company itself, but rather to create a pool of relatively inexpensive skilled labor that can then be used on an as-needed basis to fulfill the needs of third-party clients. When the visa holder is not working—i.e. "on the bench"—the employer requires her to pay her own way in contravention of the express visa requirements. The employer is thus able to procure skilled labor on the cheap with little overhead, but takes a cut of the standard rates its visa-holding employees bill out to third-party clients.

The Nandas' fraudulent scheme was a quintessential case of benching. Dibon regularly sponsored H-1B applicants and represented to the DoL and CIS that the applicants would work directly for Dibon at its headquarters in Carrollton, Texas. Dibon further represented that it would pay all visa fees and pay the applicants for all non-productive time 30 days after their arrival. Contrary to those representations, however, Dibon in fact benched the workers and required them to pay their own way until they could be placed at a third-party client to provide technology consulting services—with Dibon taking a cut of any money earned. The fraudulent scheme, which continued from 2005—2011, netted Dibon at least hundreds of thousands of dollars.

In 2014, the Nandas and others were indicted on charges stemming from their benching scheme. Several Dibon employees pleaded guilty and cooperated with the Government's prosecution of the Nandas. The Nandas were tried by jury and found guilty of: one count of conspiracy to commit visa

3

No. 16-11135

fraud in violation 18 U.S.C. § 371 and 18 U.S.C. § 1546 (a); one count of conspiracy to harbor illegal aliens in violation of 8 U.S.C. §§ 1324(a)(1)(A)(v)(I) and 1324(a)(1)(B)(i); and two counts of wire fraud in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 2. The district court sentenced each brother to 87 months' imprisonment, three years of supervised release, and restitution.

II

The Nandas raise myriad issues on appeal, challenging aspects of the trial's procedure and substance as well as their respective sentences. We address each issue in turn.

A. *Bruton* Challenge

During the Nandas' trial, the Government entered into evidence a letter Jay wrote to the DoL after he had left Dibon. In the letter, Jay confessed that "Dibon has submitted incomplete and false documentation . . . [and] continues to violate all the wage and hour conditions of the H-1B visa program including benching, no pay, LCAs, taking monies for visa[s] and running payroll for H-1B immigrants." Jay further wrote that Dibon had "not paid back wages to the tune of millions to non immigrant H-1B workers."

Atul's counsel vigorously objected to the letter's entry into evidence, arguing that its admission would violate Atul's Sixth Amendment right of confrontation under *Bruton v. United States*, 391 U.S. 123 (1968). In *Bruton*, the Supreme Court held that admission of a codefendant's confession at a joint trial where that codefendant does not take the stand violates the other defendant's Sixth Amendment right of confrontation. *Id.* at 127–28. The Court later qualified *Bruton*'s scope in *Richardson v. Marsh*, 481 U.S. 200 (1987). *Richardson* explained that *Bruton* created a "narrow exception," and held that admission of a confession did *not* violate the Sixth Amendment where "the confession was not incriminating on its face, and became so only when linked with evidence introduced later at trial." *Id.* at 207, 208. The Court further

explained that, where the codefendant's confession does not directly reference the defendant, a limiting instruction to the jury will further help mitigate against any confrontation issues. *See id.* at 208; *see also United States v. Jobe*, 101 F.3d 1046, 1067 (5th Cir. 1996) ("[T]he admission of a nontestifying defendant's confession is permissible if the trial court gives a proper limiting instruction."). Thus, under *Richardson,* "an indirect reference to a co-defendant is not enough to bring a statement within the proscription of *Bruton." United States v. Restrepo*, 994 F.2d 173, 187 (5th Cir. 1993). "*Bruton* is not violated unless [the codefendant's] statement *directly* alludes to [the defendant] . . . ." *Id.* at 186; *see also United States v. Webster*, 734 F.2d 1048, 1054 n.6 (5th Cir. 1984) ("[T]his Court has held consistently that the *Bruton* rule is not violated unless a co-defendant's statement directly alludes to the complaining defendant. . . . This is true, even if the evidence makes it apparent that the defendant was implicated by some indirect references.").

The district court conducted an extensive hearing on the letter's admissibility. It ultimately concluded that, because the reference to "Dibon" in the letter could have referred to a number of different Dibon employees and not to Atul specifically, a limiting instruction would be satisfactory to avoid any Sixth Amendment concerns. Accordingly, the district court admitted the letter and expressly instructed the jury three times not to consider any of its contents in regard to Atul. There is no allegation that the Government attempted to use the letter against Atul at any point during the trial.

Because Atul preserved his *Bruton* objection below, we review the admission of the letter for abuse of discretion, subject also to harmless error analysis. *See United States v. Powell*, 732 F.3d 361, 376 (5th Cir. 2013); *United States v. Walker*, 148 F.3d 518, 522 (5th Cir. 1998), *abrogated on other grounds by Texas v. Cobb*, 532 U.S. 162 (2001).

No. 16-11135

We agree with the district court: the letter did not "directly allude" to Atul, and so admitting it did not violate his Sixth Amendment right of confrontation. *Restrepo*, 994 F.2d at 187. Atul contends that the reference to "Dibon" was in effect a direct allusion to him personally, because the Government repeatedly stressed that Jay and Atul were the central figures in Dibon's operation. But there were a number of other Dibon employees involved in the benching scheme; "Dibon" in the letter could have referred to any of them. Atul's argument would require us to "link" the letter "with evidence introduced later at trial"—precisely what the Supreme Court instructed not to do in *Richardson*. *Richardson*, 481 U.S. at 208. Accordingly, admitting the letter did not violate Atul's rights.

We note further that, even were we to conclude that admitting the letter was error, such error would be harmless. The other evidence against Atul presented at trial was overwhelming, and included testimony from multiple Dibon employees directly implicating Atul in the benching scheme. "It is well established that a *Bruton* error may be considered harmless when, disregarding the co-defendant's confession, there is otherwise ample evidence against a defendant." *Powell*, 732 F.3d at 379. That is true here.

B. Wire Fraud Charge

The Nandas contend that the superseding indictment did not properly charge that a specific fraudulent wire communication was undertaken for the purpose of executing a scheme to obtain property or money. Instead, they argue, the wire fraud counts charged only that they schemed to make misrepresentations to the Government in order to fraudulently obtain H-1B visas. Relying on *Cleveland v. United States*, 531 U.S. 12 (2000), the Nandas maintain that visas are not "property" or "money" within the meaning of the wire fraud statute.

6

No. 16-11135

The Nandas attempt to cast this argument as a sufficiency of the evidence challenge, but it is not. It is rather a legal argument about the proper interpretation and application of the wire fraud statute. As such, because the Nandas failed to raise this contention below, it is reviewed for plain error on appeal. *See United States v. Walker*, 596 F. App'x 302, 310–11 (5th Cir. 2015) (holding that statutory arguments raised for the first time on appeal, though presented as sufficiency of the evidence arguments, were not preserved by motion for acquittal in the trial court); *United States v. Kelley*, 481 F. App'x 111, 113 (5th Cir. 2012) (holding that legal argument raised for the first time on appeal, though "couched in terms of sufficiency," should be reviewed for plain error).

It is far from clear that there was *any* error in the wire fraud charges, let alone plain error. The wire fraud counts explicitly charged the Nandas with "executing the foregoing scheme and artifice to defraud, *and to obtain money*, by means of false pretenses, [etc.]." The Nandas argue that this express charge was still ambiguous, because it did not clarify the source of the money— whether from the visa applicants themselves or by capitalizing on the fraudulent visas in another manner. But the concession that the charging language is at the very least ambiguous is tantamount to an admission that any supposed error was not plain. And that concession is fatal at the second prong of plain error review. *See Puckett v. United States*, 556 U.S. 129, 135 (2009) (explaining that, on plain error review, "the legal error must be clear or obvious, rather than subject to reasonable dispute"). Accordingly, the Nandas' argument as to the wire fraud charges fails.

C. Special Unanimity Instruction

The Nandas argue that the district court erred by not giving the jury special instructions to the effect that unanimity was required as to the specific overt acts supporting a finding of guilty on the various charges. The Nandas

7

concede that they did not move for a special instruction or otherwise raise the issue below, so this contention is reviewed for plain error. *See United States v. Razo-Leora*, 961 F.2d 1140, 1147 (5th Cir. 1992) ("We review a failure to give a special instruction on unanimity only under the narrow 'plain error' standard.").

The district court did not err in its unanimity instruction. The jury charge included the instructions that "all of you must agree" and "[y]our verdict must be unanimous on each count of the Superseding Indictment." We have held that "a general unanimity instruction is ordinarily sufficient" in conspiracy cases. *United States v. Mason*, 736 F.3d 682, 84 (5th Cir. 2013). The district court did not err by not *sua sponte* giving the jury a specialized unanimity instruction beyond the "ordinarily sufficient" unanimity instructions it did properly give.

As for the wire fraud counts, the Nandas contend that the district court should have instructed the jury that it had to be unanimous as to the specific false statements in each particular wire charged in the superseding indictment. This argument reflects a misunderstanding of the law. It is not a particular false statement within a wire, but rather each particular wire that contained a false statement, that constitutes an individual offense for purposes of the wire fraud statute. *Cf. United States v. McClelland*, 868 F.2d 704, 706 (5th Cir. 1989) (explaining, in the analogous context of mail fraud, that "[e]ach separate use of the mails to further a scheme to defraud is a separate offense"). As such, there is no need to instruct a jury that it needs to be unanimous as to a particular false statement within a given wire. *See United States v. LaPlante*, 714 F.3d 641, 647 (1st Cir. 2013) ("[T]he jury is not required to agree on the means—the specific false statement—[Defendant] used to carry out her fraudulent scheme.").

8

No. 16-11135

D. Constructive Amendment of the Superseding Indictment

The Nandas argue that the Government's evidence at trial constructively amended the Superseding Indictment in violation of their Fifth Amendment right to a grand jury indictment. *See United States v. Griffin*, 800 F.3d 198, 202 (5th Cir. 2015) ("[A]fter an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself.") (quoting *Stirone v. United States*, 361 U.S. 212, 215–16 (1960)). They contend the Government constructively amended the Superseding Indictment by: (1) introducing evidence of many visa petitions containing false statements, most of which did not relate to persons named in the Superseding Indictment; and (2) introducing evidence that the H-1B applications were falsified because the Nandas did not pay for medical insurance during times when the workers were not working.

"[A] constructive amendment occurs when the court 'permits the defendant to be convicted upon a factual basis that effectively modifies an essential element of the offense charged' or upon 'a materially different theory or set of facts than that which [the defendant] was charged." *United States v. Chaker*, 820 F.3d 204, 210 (5th Cir. 2016) (quoting *United States v. McMillan*, 600 F.3d 434, 451 (5th Cir. 2010) (alteration in original)). Because the Nandas did not preserve the constructive amendment argument below, it is reviewed for plain error.

We are not convinced that admitting the additional visa petitions and medical insurance evidence was error. But we need not reach that issue because, even granting *arguendo* that it was, the Nandas cannot establish that it affected their substantial rights. We have previously found that a constructive amendment does not affect defendants' substantial rights under plain error review where "[i]t is improbable that the jury would have concluded that [the defendants] were innocent if only the evidence of which the

9

defendants now complain had been excluded." *United States v. Bohuchot*, 625 F.3d 892, 900 (5th Cir. 2010). Here, even if the challenged evidence were stripped away, the remaining evidence was still more than enough to convict the Nandas. For example, four different former Dibon employees—all of whom were expressly referenced in the Superseding Indictment—testified extensively regarding the Nandas' benching scheme and various misrepresentations made to them and in their visa documents. Thus, because it is "improbable" that the jury would have acquitted the Nandas absent the challenged evidence, their argument fails at the third prong of plain error review. *See Puckett,* 556 U.S. at 135 ("Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the district court proceedings.") (internal quotation marks omitted).

E. Sentencing Enhancement

The Presentence Investigation Report ("PSR") recommended a two point sentencing enhancement pursuant to U.S.S.G. §§ 2B1.1(b)(10)(B) and (C) for committing a substantial portion of the alleged scheme from outside the United States and for committing an offense involving sophisticated means of concealment. The Nandas objected to the enhancement, arguing that there was not sufficient evidence to show that a substantial portion of the fraud occurred *from* outside the United States. The district court overruled the objection.

The parties dispute at length the proper interpretation of the phrase "from outside the United States." The Nandas argue that the word "from" indicates that a substantial portion of the fraud itself must take place outside the U.S. The Government, by contrast, argues that the enhancement "doesn't require that the fraud be committed from outside the United States." For our

part, we have not yet had opportunity to address this particular sentencing enhancement as applied to conspiracy charges, nor need we now.[1]

We "may affirm the district court's judgment on any basis supported by the record." *United States v. Chacon*, 742 F.3d 219, 220 (5th Cir. 2014). Here, the PSR expressly included the sophisticated means prong as an alternate ground for applying the sentencing enhancement. Indeed, the Nandas objected to that portion of the PSR directly, and the probation officer's response in the Addendum to the PSR makes clear the ample record evidence supporting a finding that they used sophisticated means to conceal their fraud. The probation officer explained that, "the fraud schemes committed by the defendant[s] were sophisticated and involved detailed information being submitted to various Governmental agencies that had to match each other to obtain the fraudulent visas." The Nandas "also set up a 'training center' that was used to launder the visa processing fees paid for by the victims." Finally, the Nandas "maintained apartments for the victims to live in while they were benched." This evidence is more than enough to support a finding that the Nandas used sophisticated means to conceal their fraud. The district court adopted these findings and conclusions. Thus, the record supports application of the enhancement for the use of sophisticated means of concealment.

F. Loss Amount Calculation

The district court concluded that the actual loss from the Nandas' fraud was $600,000. Because that number was greater than $550,000, the Nandas' base offense level under the sentencing guidelines was 29; had the number been less than $550,000 their base offense level would have been 27. The

---

[1] We did address the enhancement in *United States v. Lawal*, 235 F. App'x 320, 321 (5th Cir. 2007), but that short unpublished opinion did not pertain to conspiracy.

Nandas contend that the district court erred in its calculation; the Government argues that the $600,000 number was easily supported by the record evidence.

We need not delve too deeply into the precise methodology the district court used to reach that number, however, because any possible error in the loss calculation was certainly harmless. This is so because the district court repeatedly and explicitly explained that it would have imposed the same sentence regardless of whether the loss amount was more or less than the key $550,000 threshold. The district court noted, for example, "that the sentence that the Court imposed would be the sentence that the Court would impose, even if I sustained your objection that I have overruled and reduced the loss amount two further levels. I would have been imposing the same sentence I just did." We have repeatedly held that, when a district court entertains arguments as to the proper guidelines range and explicitly states that it would have given the same sentence it did regardless, any error in the range calculation is harmless. *See, e.g., United States v. Richardson*, 676 F.3d 491, 511 (5th Cir. 2012) (citing *United States v. Duhon*, 541 F.3d 391, 396 (5th Cir. 2008); *United States v. Bonilla*, 524 F.3d 647, 656 (5th Cir. 2008)) ("[A] guidelines calculation error is harmless where the district court has considered the correct guidelines range and has stated that it would impose the same sentence even if that range applied."). Because the district court explicitly considered both guidelines ranges—i.e. with and without the additional two points for a loss amount over $550,000—and expressly stated it would give the same sentence either way, any error in the loss amount calculation was harmless.

G. Sentencing Disparity

The Nandas argue that the district court did not properly consider sentencing disparity—one of the factors outlined in 18 U.S.C. § 3553(a)—when it sentenced both brothers. This argument borders on the frivolous. The district

court heard a full-throated argument from defense counsel regarding sentencing disparity, and then indicated that it did not need to hear the Government's rebuttal argument. The obvious implication of this interchange was that the district court *did* consider the issue of sentencing disparity, but found the Nandas' contentions unavailing.

## III

The Nandas' convictions and sentences are AFFIRMED.