# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
November 15, 2022

Lyle W. Cayce
Clerk

No. 21-10996

United States of America,

*Plaintiff—Appellee*,

*versus*

Jonathan Dean Davis,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:20-CR-575

Before Clement, Duncan, and Wilson, *Circuit Judges*.
Stuart Kyle Duncan, *Circuit Judge*:

Jonathan Dean Davis was convicted of numerous wire-fraud and money-laundering charges arising from a fraudulent scheme to cause the Department of Veterans Affairs to pay over $71 million in GI-Bill funding to his trade school. Davis raises a menagerie of challenges to his convictions and his sentence. We affirm in nearly all respects, except that we vacate the forfeiture order and remand for further proceedings.

No. 21-10996

## I. Factual and Procedural Background

On March 25, 2021, Davis was named in a thirteen-count superseding indictment filed in the Northern District of Texas.[1] Counts 1 through 7 charged Davis with Wire Fraud, in violation of 18 U.S.C. § 1343; and Counts 10 through 13 charged Davis with Money Laundering and Aiding and Abetting, in violation of 18 U.S.C. §§ 1952, 1957.[2] Following a trial, a jury convicted Davis on each of these counts on April 15, 2021.

The charges stemmed from a scheme Davis concocted to defraud the Department of Veterans Affairs ("VA") of vast sums of money. To understand this scheme, consider first some background information on the VA and the Post 9/11 Veterans Educational Assistance Act of 2008 ("GI Bill"). The GI Bill is an educational benefits program that provides financial assistance to eligible student-veterans. The VA agrees to pay up to a certain amount of a student's tuition and fees at VA-approved schools. Notably, this means that for a school to receive tuition payments through GI-Bill funding, it must first go through an approval process. This approval is necessary to ensure that veterans receive sound training and that taxpayer funds are not wasted. *See Cleland v. Nat'l Coll. of Bus.*, 435 U.S. 213, 219 (1978). Approval requirements include that the school must have been continuously operational for at least two years and have demonstrated financial stability. To help in the approval process, the VA relies on state-approving agencies that determine which educational institutions are eligible. In Texas, that

---

[1] The superseding indictment is identical to the initial indictment filed on November 18, 2020, except the superseding indictment reflects corrections to minor date errors.

[2] Counts 8 and 9 charged Davis with Aggravated Identity Theft, in violation of 18 U.S.C. §§ 1022, 1028A. The jury found Davis not guilty of those charges, so they are not at issue in this appeal.

agency was the Texas Veterans Commission ("TVC"). The TVC ensures compliance with the two-year requirement and also independently requires schools to obtain a Certificate of Approval from the Texas Workforce Commission ("TWC").

We turn to the defendant and the conduct that culminated in his convictions. Davis had been working in the heating, ventilation, and air conditioning ("HVAC") industry since he was 18 years old. In 2005, he began training members of the HVAC industry through his business, Jon Davis Companies, Inc. In 2013, he incorporated a separate business, Retail Ready Career Center Inc. ("Retail Ready"), and opened a company bank account for it. This new entity became a for-profit trade school that offered a six-week HVAC training course for students. The students were primarily military veterans, although some civilian students were also enrolled. The student-veterans would use their GI-Bill funding to pay Retail Ready's tuition.

For Retail Ready to obtain GI-Bill funding when training veterans, Davis first had to obtain VA approval. This is where the fraudulent scheme began. The Government alleged that, in the course of the VA-approval process, Davis "made a series of misrepresentations to fraudulently obtain VA approval for Retail Ready and to fraudulently induce veterans to enroll as students at Retail Ready." The first step began with the TWC, from which Davis had to receive a Certificate of Approval. In his application, Davis submitted Retail Ready's audited financial statements and certified they were true and correct. But they were not—a fact that Davis himself conceded. Further, the application certified no criminal or civil actions were pending against the school or its owners and officers. Once more, this was not true (Davis had a charge pending against him)—and once more, Davis himself conceded this fact. As further evidence of the falsehoods submitted to the TWC, the Government invoked an electronic journal Davis kept on his

computer. In this journal, Davis recounted his interaction with the accountant auditing Retail Ready. Davis wrote: "I then finally found an accountant that will do the audit the way I need it done for $1,000.00." He further explained: "I lied to the accountant that I am using for my audit service, I told him that I don't have anything in the company name other than a lease and I left out having Jay being an employee and that I've had a bank account with expenses out of it because it is a disaster and wouldn't project a very good picture."

The next step in this series of falsehoods, the Government alleged, was that Davis lied to the TVC. In his application to the TVC for VA approval, Davis certified that Retail Ready had continuously operated as an educational institution for the previous two years. This was false. Retail Ready incorporated in May 2013 and Davis certified the two-year requirement was met when he applied in August 2014. The Government also alleged that Davis lied about Retail Ready's being in sound financial condition by once more providing a second set of misleading financial statements. As a result of these misrepresentations to the state-approving agencies, the Government alleged that the VA approved Retail Ready to begin accepting GI-Bill payments on behalf of student-veterans on August 7, 2014.

The Government next alleged that Davis advanced this scheme by lying to the students themselves. Specifically, Davis induced the veterans to enroll at Retail Ready while concealing the fact that the school had only been approved as a result of the aforementioned fraud. Davis also allegedly misrepresented the career prospects of Retail Ready graduates, and he allegedly concealed just how much of the students' GI-Bill funding would be depleted. Several former student-veterans testified on these points, saying that they were unaware of the fraudulently obtained VA approval; that they were told they would be prepared to work as technicians making $15–$16 an

hour but then struggled to find work; and that Retail Ready did not disclose how many months of their GI-Bill benefits would be depleted.

Now consider how all this relates to the wire-fraud and money-laundering charges at issue. Corresponding to each wire-fraud count, the superseding indictment identified seven Retail Ready students who paid their tuition and fees—ranging from $18,053.10 to $20,059.00—through GI-Bill funding. The indictment also identified four specific purchases, corresponding to each of the four money-laundering counts, that Davis made with proceeds derived from unlawful activity—in this case, the foregoing wire fraud scheme. Those four purchases were: a luxury home for over $2.2 million, a Lamborghini for roughly $430,000, a Ferrari for roughly $280,000, and a Bentley for roughly $260,000.

In April 2021, the jury convicted Davis of these counts. He was then sentenced by the district court. His Presentence Report ("PSR") recommended a total offense level of 38. This consisted of 7 base-level points for wire fraud, a 24-point increase for an intended loss amount of over $72 million, a 2-point increase for using mass marketing, a 2-point increase for using sophisticated means, a 1-point increase for money laundering, and a 2-point increase for obstruction of justice. This yielded a guideline range of 235 to 293 months of imprisonment. Davis objected, arguing the proper offense level was 8, which should have yielded a custody range of 0 to 6 months imprisonment. Disagreeing, the district court sentenced Davis to 235 months of imprisonment. It also ordered $65,200,000 in restitution to the VA, based on the agency's actual loss. Finally, it entered a forfeiture order based on the gross amount of VA funds—over $72 million—that Retail Ready received. Davis now appeals on numerous grounds.

## II. Sufficiency of the Evidence

We begin with Davis's sufficiency challenges. Where a defendant properly preserves a sufficiency challenge, as Davis did by moving for acquittal in the district court, we review the challenge *de novo. United States v. Huntsberry*, 956 F.3d 270, 279 (5th Cir. 2020). Our review, however, is "highly deferential to the verdict, and, viewing the evidence in the light most favorable to the prosecution, we consider whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Ibid.* (internal quotation marks and citations omitted); *see generally Jackson v. Virginia*, 443 U.S. 307 (1979). "We accept all credibility choices and reasonable inferences made by the trier of fact which tend to support the verdict and resolve conflicts in the evidence in favor of the verdict." *Huntsberry*, 956 F.3d at 279 (internal quotation marks and citations omitted).

### A. Wire Fraud

First, we conclude the seven wire-fraud counts are sufficiently supported by the evidence.

Federal law makes it a crime to use interstate wire communications to carry out a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1343. To establish a violation of this statute, the Government must prove: "(1) a scheme to defraud exists, (2) the defendant used wire communications in interstate or foreign commerce to further that scheme, and (3) the defendant had specific intent to defraud." *United States v. del Carpio Frescas*, 932 F.3d 324, 329 (5th Cir. 2019).

Davis makes four arguments to support his contention that the evidence was insufficient. Each is unavailing.

First, Davis argues that neither he nor anyone working for Retail Ready was involved in making the seven wires; rather, they were made by the U.S. Treasury at the request of a VA employee. This misunderstands the elements of wire fraud. The evidence need not show that Davis *personally* transferred the funds from the VA into Retail Ready's bank accounts. It need show only that he "transmit[ted] or cause[d] to be transmitted" the relevant communications. 18 U.S.C. § 1343; *see United States v. Johnson*, 700 F.2d 163, 177 (5th Cir. 1983) ("It is not necessary to find that Johnson placed the calls himself in order to find that he 'caused them to be placed.'" (quoting *Pereira v. United States*, 347 U.S. 1 (1954)).

Second, Davis argues the Government failed to prove facts alleged in the indictment because there was no evidence of Davis's conduct on the specific dates of the wires. However, the Government was not required to prove that Davis did something on those precise dates. Its theory was that Davis caused all the transfers to go through as a result of his initial deceptions in the VA-approval process and the continual enrollment of veterans in the program.

Third, Davis argues there was no evidence of a "scheme to defraud" because he lied only about "ancillary matters" and not about Retail Ready's services. *See, e.g.*, *United States v. Takhalov*, 827 F.3d 1307, 1313 (11th Cir. 2016) (a "scheme to defraud" under § 1343 refers only to "lies about the nature of the bargain itself"). Davis adds that a "scheme to defraud" encompasses lying to take away someone's property but not to obtain a government license. *Cf. Cleveland v. United States*, 531 U.S. 12, 19–20 (2000) (a "scheme to defraud" under § 1341 does not reach fraud in getting a government license because "such a license is not 'property' in the government regulator's hands"). These arguments are mistaken. The evidence showed Davis's misrepresentations to the VA induced the agency to pay millions in GI-Bill benefits to a school ineligible to receive them. The

falsehoods went to the "nature of the bargain" (whether the school was eligible for benefits) and defrauded the government of money, not a license. *Cf. Kelly v. United States*, 140 S. Ct. 1565, 1572–74 (2020) (contrasting "a scheme to alter [the government's] . . . regulatory choice" with a scheme "to take the government's property").

Fourth, Davis argues that the specific intent requirement was not satisfied since the Government presented no evidence of any intent to defraud in 2016 or 2017, which is when the seven wire transfers occurred. We disagree. The Government presented evidence that Davis "lied to [his] accountant," and lied about satisfying the two-year requirement—a requirement he knew was essential for TVC approval based on his previous company's denial on that basis and warnings listed on the TVC's application form. Davis's insistence that this only establishes a culpable intent at one point in time, and not years later when the wires occurred, is inapt because his lies led to an ongoing receipt of funds to which he was not entitled. *See United States v. Traxler*, 764 F.3d 486, 489 (5th Cir. 2014) (distinguishing "one-shot" operations from "ongoing ventures").

In sum, Davis fails to show that the evidence was insufficient to allow a rational jury to convict him on the wire-fraud counts.

## B. Money Laundering

The evidence similarly supported Davis's conviction on the money-laundering counts.

Federal law makes it a crime to "knowingly engage[] or attempt[] to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and [sic] is derived from specified unlawful activity." 18 U.S.C. § 1957(a); *see also id.* § 1957(d). This requires proving three elements: "(1) property valued at more than $10,000 that was derived from a specified unlawful activity, (2) the defendant's engagement in a financial

transaction with the property, and (3) the defendant's knowledge that the property was derived from unlawful activity." *United States v. Moparty*, 11 F.4th 280, 298 (5th Cir. 2021).

Davis does not contest that the four transactions comprising the money-laundering charges occurred—that is, that he purchased the luxury house and the three luxury cars. Rather, Davis contests only the first and third elements, arguing that the evidence was insufficient to establish that at least $10,000 of each of those transactions was derived from unlawful activity, and also insufficient to establish his knowledge that the property was criminally derived.

We first consider Davis's argument that no evidence connected the seven wire-fraud charges to the four transactions. Davis observes that six of the seven wires mentioned in the indictment occurred before the four money-laundering transactions and that those six wires amounted to $113,352.10.[3] He relies on the "clean-funds-out-first rule," which provides that "where an account contains clean funds sufficient to cover a withdrawal, the Government [cannot] prove beyond a reasonable doubt that the withdrawal contained dirty money." *United States v. Evans*, 892 F.3d 692, 708 (5th Cir. 2018) (quoting *United States v. Loe*, 248 F.3d 449, 467 (5th Cir. 2001)). Because there were thousands of deposits into Retail Ready's accounts totaling millions of dollars beyond the seven specifically alleged fraudulent wires, Davis contends he should have been acquitted since he could have paid for the home and the three cars with clean funds.[4]

---

[3] The seventh wire occurred after the money-laundering transactions, and so the funds used in those transactions could not have derived from that seventh wire.

[4] Davis also argues that, in any event, relying on uncharged acts of wire fraud constitutes an unconstitutional constructive amendment of the indictment. We disagree. The statute "does not require the indictment to specify which unlawful activity generated

We disagree. To begin with, Tracy Clark-Ross, a forensic auditor at the VA, testified that the deposits into Davis's bank accounts amounted to $72.2 million in VA funds and $366,000 in other deposits. The total of the money-laundering transactions—$3.2 million—far exceeded the $366,000 in clean funds, and so sufficient evidence showed that Davis necessarily relied on tainted funds to make these purchases. This is illustrated by our discussion of the "clean-funds-out-first-rule" in *Evans*. Addressing a situation where "a defendant makes several withdrawals, each individually for less than the clean-fund total in his account," *Evans* explained:

> Viewed individually, a particular withdrawal would only use clean money, even though in aggregate the defendant would have had to dip into tainted funds. To cope with this problem, we aggregate the transactions—when the aggregate amount withdrawn from the account exceeds the clean funds, individual withdrawals may be said to be of tainted money, even if a particular withdrawal was less than the amount of clean money in the account.

*Id.* at 708–09 (cleaned up). As *Evans* shows, because $3.2 million exceeds $366,000 in clean money, Davis's conviction stands.

We next consider Davis's argument that no evidence suggests he was aware of any crime at the time of the four transactions. We again disagree. The knowledge element of money laundering "requires that the defendant know that the property in question is 'criminally derived,' although it does

---

the funds in question." *Loe*, 248 F.3d at 468. Rather, "'[n]othing more need be alleged' than that the laundered money was the proceeds of wire fraud in violation of § 1343." *United States v. Caldwell*, 302 F.3d 399, 413 (5th Cir. 2002) (quoting *United States v. Smith*, 44 F.3d 1259, 1265 (4th Cir. 1995)). The Government was thus free to pursue seven specific wire-fraud charges, while nevertheless insisting on the existence of a broader fraudulent scheme, involving a plethora of fraudulent wires, from which funds were derived for the four money-laundering charges.

not require knowledge that the property was derived from 'specified unlawful activity.'" *United States v. Pettigrew*, 77 F.3d 1500, 1513 (5th Cir. 1996). And "criminally derived property" is defined as "any property constituting, or derived from, proceeds obtained from a criminal offense." 18 U.S.C. § 1957(f)(2). Once more, given that all of the VA funds sent to Retail Ready constituted the proceeds of criminal offenses, sufficient evidence supports Davis's knowing those funds were criminally derived. For example, the statements in his journal that "more lying is in order" and that "[he] lied to the accountant," support the proposition that Davis knew he was acquiring his VA approval through fraud.

In sum, Davis fails to show the evidence was insufficient to allow a rational jury to convict him on the money-laundering counts.

### III. Indictment and Bill of Particulars

Davis also argues that the indictment was faulty and that the district court should have ordered a bill of particulars.

"We review de novo a district court's denial of a motion to dismiss the indictment, including any underlying constitutional claims." *United States v. Cordova-Soto*, 804 F.3d 714, 718 (5th Cir. 2015). We review the denial of a bill of particulars for abuse of discretion. *See United States v. Lavergne*, 805 F.2d 517, 520 (5th Cir. 1986) ("Demonstrating reversible error in the denial of such a motion is a heavy burden: 'The denial of a bill of particulars is within the sound discretion of the trial judge.'" (quoting *United States v. Montemayor*, 703 F.2d 109, 117 (5th Cir. 1983))).

For an indictment to be sufficient, it must "(1) contain[] the elements of the offense charged; (2) fairly inform[] the defendant of the charges he must prepare to meet; and (3) enable[] a defendant to plead an acquittal or a conviction in bar to future prosecutions for the same offense." *United States v. Moody*, 923 F.2d 341, 351 (5th Cir. 1991). These requirements "stem[]

directly from one of the central purposes of an indictment: to ensure that the grand jury finds probable cause that the defendant has committed each element of the offense, hence justifying a trial, as required by the Fifth Amendment." *United States v. Cabrera-Teran*, 168 F.3d 141, 143 (5th Cir. 1999). Accordingly, an indictment must be "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1).

A bill of particulars is designed "to apprise the defendant of the charge against him with sufficient precision to enable him to prepare his defense." *Montemayor*, 703 F.2d at 117. But "[i]t is not designed to compel the government to detailed exposition of its evidence or to explain the legal theories upon which it intends to rely at trial." *United States v. Burgin*, 621 F.2d 1352, 1359 (5th Cir. 1980). After all, "[a] defendant possesses no right to a bill of particulars." *Id.* at 1358. As such, in reviewing the denial of a bill of particulars, we "can reverse only when it is established that defendant was actually surprised at trial and therefore was prejudiced in his substantial rights." *Montemayor*, 703 F.2d at 117.

The money-laundering counts of the superseding indictment alleged that four transactions involved property "derived from a specified unlawful activity, namely wire fraud." Davis argues that because the superseding indictment failed to identify the purported acts constituting wire fraud, it was faulty and rendered Davis unable to prepare an adequate defense. Specifically, the superseding indictment identified only seven acts of wire fraud that together amounted to $131,405.20. But the money-laundering charges involved transactions totaling millions of dollars. So, Davis argues that there must be a slew of unidentified crimes underlying the money-laundering charges. Because these were unspecified, Davis argues the superseding indictment was constitutionally deficient.

We disagree. The superseding indictment amply set forth the alleged scheme to defraud the VA and Retail Ready students. It alleged that Davis lied to his accountant, causing the accountant to prepare false and misleading financial statements that were then submitted to the TWC; that Davis lied about the existence of pending criminal or civil charges; that Davis lied about Retail Ready's continuous operation for two years; and that Davis lied once more with false financial statements submitted to the TVC. The superseding indictment then went on to allege that these misrepresentations induced the VA to approve Retail Ready to begin accepting GI-Bill payments and that Davis concealed the fraudulently obtained VA approval from Retail Ready's students. It then alleged four transactions involving money that derived from funds obtained from this scheme.

The indictment thus provided Davis adequate notice about the underlying wire fraud that served as the basis for the money-laundering charges. Although the indictment only alleged seven specific acts of wire fraud, it is clear from the indictment, read as a whole, that the Government was alleging that Retail Ready was categorically ineligible to receive GI-Bill funding. As such, all GI-Bill payments to the school would have represented unlawfully acquired funds. *See Loe*, 248 F.3d at 468 (explaining that the money-laundering statute "does not require the indictment to specify which unlawful activity generated the funds in question"). Davis responds that "the word 'ineligible' appears zero times in the Indictment." That is beside the point. What matters is whether the nature of the criminal charges was evident. The indictment made that plain for anyone to see.

Accordingly, we conclude that the indictment was not faulty and the district court did not err in declining to order a bill of particulars.

No. 21-10996

## IV. Jury Instructions

Davis next challenges the jury instructions, arguing that (1) the wire-fraud instruction was an impermissible constructive amendment of the indictment, and (2) the money-laundering instruction was erroneous.

### A. Wire-Fraud Instruction and Constructive Amendment

"This Court reviews a constructive amendment claim *de novo*." *United States v. Bennett*, 874 F.3d 236, 256 (5th Cir. 2017). "We scrutinize any difference between an indictment and a jury instruction and will reverse only if that difference allows the defendant to be convicted of a separate crime from the one for which he was indicted." *Ibid.* (quoting *United States v. Jara-Favela*, 686 F.3d 289, 300 (5th Cir. 2012)).[5]

The Fifth Amendment guarantees criminal defendants a right to "indictment of a Grand Jury." U.S. Const. amend. V; *see, e.g.*, *United States v. Griffin*, 800 F.3d 198, 202 (5th Cir. 2015) ("[A]fter an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself." (quoting *Stirone v. United States*, 361 U.S. 212, 215–16 (1960))). From this it follows that constructive amendments, which "occur[] when the court 'permits the defendant to be convicted upon a factual basis that effectively modifies an essential element of the offense charged' or upon 'a materially different theory or set of facts than that which [the defendant] was charged,'" are impermissible. *United States v. Nanda*, 867 F.3d 522, 529 (5th Cir. 2017) (citations omitted).

---

[5] The Government contends that we should apply plain-error review because Davis did not preserve this objection to the indictment. *See United States v. Daniels*, 252 F.3d 411, 414 n.8 (5th Cir. 2001). We disagree and analyze the issue *de novo*. At trial, Davis's counsel argued that "the phrase 'at least one of' needs to be struck." The district court understood the objection, overruled it, and even acknowledged that the issue could be raised on appeal.

Davis's argument relies on a slight difference in wording between the indictment and the jury instructions. He observes that the superseding indictment alleged that he "made a *series* of misrepresentations to fraudulently obtain VA approval for Retail Ready and to fraudulently induce veterans to enroll as students at Retail Ready." By contrast, the jury instructions state that the scheme to defraud must have "employed *at least one of* the following false material representations, false material pretenses, or false material promises as part of the scheme." Davis argues that by allowing him to be convicted for a scheme involving only one misrepresentation instead of a "series of misrepresentations," the district court impermissibly broadened the grounds on which he could be convicted. Davis also contends that a subsequent jury instruction—which stated that the Government must have proved a scheme that "was substantially the same as the one alleged in the superseding indictment"—was insufficient to cure the erroneous instruction.[6]

Davis's arguments are unavailing. Fundamentally, Davis's complaint is "not that the indictment failed to charge the offense for which he was convicted, but that the indictment charged more than was necessary." *United States v. Miller*, 471 U.S. 130, 140 (1985). Whereas wire fraud only requires a single misrepresentation, the indictment referred to a "*series* of misrepresentations"—*more* than what was necessary to convict. But "the right to a grand jury is not normally violated by the fact that the indictment alleges more crimes or other means of committing the same crime." *Id.* at 136. Thus, the Government could have chosen to prove its case by relying on

---

[6] Davis also briefly argues that the jury instruction eliminated the unanimity requirement. But "the jury is not required to agree on the means—the specific false statement—[the defendant] used to carry out [his] fraudulent scheme." *Nanda*, 867 F.3d at 529 (quoting *United States v. LaPlante*, 714 F.3d 641, 647 (1st Cir. 2013)).

any of the means described in the indictment. And, in fact, the jury instructions still referred to all the same misrepresentations alleged in the indictment.

## B. Money-Laundering Instruction

Davis next challenges the jury instructions on money laundering. We review this challenge for abuse of discretion. *See United States v. Daniels*, 247 F.3d 598, 601 (5th Cir. 2001). A trial judge has "substantial latitude in tailoring his instructions as long as they fairly and adequately cover the issues presented in a case." *United States v. Hunt*, 794 F.2d 1095, 1097 (5th Cir. 1986) (citation omitted).

Davis argues the district court should have identified the crimes that the jury had to find were the source of the "criminally derived property." Instead, the court instructed the jury "that criminally derived property was derived from the wire fraud scheme described on pages 7–12 of these instructions." This "scheme," Davis suggests, refers not to a specific instance of wire fraud or other criminal act, but merely to an idea. And this fact, Davis contends, allowed the prosecution to escape the burden of proving thousands of instances of wire fraud.

This argument fails for the same reasons as Davis's previous argument that the money-laundering counts were limited by the seven specific wires charged in the indictment. *See supra* 13–14. The instruction that the funds used in the money-laundering transactions must be "derived from the wire fraud scheme" refers to the same premise that Retail Ready was categorically ineligible to receive VA funds and that it only received them as a result of Davis's misrepresentations. As before, the money-laundering statute "does not require the indictment to specify which unlawful activity generated the funds in question." *Loe*, 248 F.3d at 468. Rather, it "merely

requires money to be derived from a particular set of federal crimes." *Ibid.* We therefore reject Davis's challenge to the money-laundering instruction.

## V. Tracy Clark-Ross's Testimony

Davis also contends the district court erred by admitting expert testimony from Tracy Clark-Ross, a forensic auditor at the VA. We disagree.

Davis preserved his objection to Clark-Ross's testimony, so we review for abuse of discretion, subject to a harmless-error analysis. *United States v. Demmitt*, 706 F.3d 665, 670 (5th Cir. 2013). Under Federal Rule of Evidence 701, a lay witness's testimony is limited to only those opinions or inferences that are "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Whereas "expert testimony results from a process of reasoning which can be mastered only by specialists in the field," "lay testimony results from a process of reasoning familiar in everyday life." Fed. R. Evid. 701 advisory committee's note to 2000 amendment.

First, some background on Clark-Ross's testimony. Clark-Ross is a forensic auditor with the VA. Her job includes tracing assets and following the flow of funds. In this capacity, she reviewed thousands of pages of Davis's and Retail Ready's bank records. Through a careful review of those records and a process of addition and subtraction, Clark-Ross determined Davis's accounts included over $72 million in VA funds and $366,000 in non-VA funds. A chart summarizing the flow of funds from the VA to Davis to the four alleged money-laundering purchases came into evidence during Clark-Ross's testimony. She also testified that based on the amount of non-VA money in the bank accounts, those four transactions could not have occurred without using the VA-derived money.

Davis argues that this was improperly admitted expert testimony. He challenges the admission of the chart, arguing the sums it depicts are based on mathematical calculations that are expert in nature. He also challenges the district court's allowing Clark-Ross to describe her process of adding up the funds through a hypothetical, rather than going through the thousands of transactions one-by-one at trial. Because this testimony was expert in nature, Davis contends, the jury should have been able to evaluate Clark-Ross's qualifications and reliability, as well as the factual basis for her testimony. And because Clark-Ross was the only such tracing witness, Davis asserts that improperly admitting her testimony was not harmless.

We disagree. All of Clark-Ross's testimony relied on basic math. She looked at bank records to calculate $72 million in VA funds and $366,000 in non-VA funds. She then relied on simple but tedious calculations to determine that the four purchases (amounting to $3.2 million) exceeded the amount of clean funds in Davis's accounts ($366,000). To be sure, the *volume* of the math required was large. But nothing about that process—reviewing the records and engaging in addition and subtraction—suggests it can be mastered only by specialists in the field with particularized expertise. *See Ryan Dev. Co., L.C. v. Ind. Lumbermens Mut. Ins. Co.*, 711 F.3d 1165, 1170 (10th Cir. 2013) (upholding admission of accountants' testimony that relied on "basic arithmetic, personal experience, and no outside expert reports in calculating lost income and other claims for coverage"); *United States v. Shaw*, 891 F.3d 441, 454 (3d Cir. 2018) ("His testimony was based on subtraction, not 'scientific, technical, or other specialized knowledge within the scope of Rule 702'"). Consequently, Rule 701(c) was not violated. Moreover, because her review of the records saved the court and jury copious time, Clark-Ross's testimony was helpful to the trier-of-fact, satisfying Rule 701(b). *See United States v. Georgiou*, 777 F.3d 125, 143–44 (3d Cir. 2015) (upholding admission of lay testimony that included summaries of

No. 21-10996

voluminous records). We therefore reject Davis's argument that Clark-Ross's testimony was improperly admitted.

## VI. Sentencing

Davis also contests his sentence, which has three elements: a restitution order, a prison sentence, and a forfeiture order. We affirm the district court with respect to the first two elements but vacate and remand the forfeiture order for further consideration.

### A. Restitution

We review restitution orders for abuse of discretion and fact findings for clear error. *United States v. Barnes*, 979 F.3d 283, 313 (5th Cir. 2020). "A factual finding is clearly erroneous only if based on the record as a whole, we are left with the definite and firm conviction that a mistake has been committed." *United States v. Sharma*, 703 F.3d 318, 322 (5th Cir. 2012) (quotation marks omitted).

The district court adopted the PSR's proposal that the VA be paid $65,200,000 in restitution. *See generally* 18 U.S.C. § 3663A(a)(1), (a)(2), (c)(1) (mandating restitution for certain crimes). Davis objects to this amount for three reasons. First, because Retail Ready actually provided services (HVAC training) to veterans at the price the VA agreed to pay, the district court's awarding as restitution the gross amount the VA paid—without any consideration of services rendered—was erroneous. Second, as a result of this restitution award, the VA receives an impermissible windfall; the VA discharged its obligation to pay for student-veterans' education but would now be getting that money back. Third, evidence of Davis's causing the loss is lacking because the seven wire fraud convictions involved a total of $131,405.20, not $65,200,000.

Each of these arguments is meritless. First, Davis's focus on the services he provided to Retail Ready students is misplaced. "Restitution is remedial in nature; its goal is to make the victim whole." *United States v. Sanjar*, 853 F.3d 190, 215 (5th Cir. 2017); *see also United States v. Williams*, 712 F. App'x 376, 383 (5th Cir. 2017). Thus, we consider "the victims' loss," not the gross gain by the defendant. *United States v. Klein*, 543 F.3d 206, 215 (5th Cir. 2008). In cases involving "government benefits," like this one, "loss shall be considered to be not less than the value of the benefits obtained by unintended recipients or diverted to unintended uses, as the case may be." U.S.S.G. § 2B1.1, cmt. (n. 3(F)(ii)). This means that a defendant is entitled to a credit for the fair market value of services rendered if he shows the benefits program would have paid for the services had he not fraudulently billed them. *See United States v. Mahmood*, 820 F.3d 177, 193 (5th Cir. 2016) (citing *Klein*, 543 F.3d at 213–14); *see also* U.S.S.G. § 2B1.1, cmt. (n. 3(E)(i)). But where the benefits program would not have paid for the services absent the fraud, the defendant is entitled to no such credit. *See Mahmood*, 820 F.3d at 193–94 (citing *United States v. Jones*, 664 F.3d 966, 984 (5th Cir. 2011); *United States v. Echols*, 574 F. App'x 350, 360–61 (5th Cir. 2014) (unpublished)). Davis fraudulently misrepresented Retail Ready's compliance with statutory requirements and billed the VA for the HVAC training his school provided. Thus, the VA was the victim of Davis's scheme. *See Mahmood*, 820 F.3d at 193 (determining the government program was "the victim of the [defendant's] fraud"); *Jones*, 664 F.3d at 984 ("Here, the Appellants were convicted of defrauding the government . . . therefore, the government is the relevant victim[.]"). So, regardless of any educational benefit Retail Ready's students might have received, the VA itself, as the victim, would not have paid for anything absent Davis's fraudulent misrepresentations. *See Jones*, 664 F.3d at 984.

Davis's other arguments are also unavailing. His windfall argument refers to cases teaching merely that a court cannot "award a windfall greater than the victim's actual loss." *United States v. De Leon*, 728 F.3d 500, 506 (5th Cir. 2013) (citing *United States v. Beydoun*, 469 F.3d 102, 107–08 (5th Cir. 2006)). As already explained, Davis overlooks that the Government was the victim, and its actual loss was the $65.2 million it was fraudulently induced to pay. There was no "windfall." As for Davis's focus on the seven specifically charged wire transfers, we have already explained why this is mistaken: the broader scheme—not just the specific wires—is itself an element of the offense, and sufficient evidence showed Davis is responsible for that scheme.

Accordingly, the district court did not err in its restitution determinations.

## B. Imprisonment

Davis next contests his 235-month sentence of imprisonment.

"Though we review a sentence for abuse of discretion, we review the district court's application of the guidelines *de novo* and its findings of fact at sentencing for clear error." *Klein*, 543 F.3d at 213 (citation omitted). "The district court's loss calculation is generally a factual finding that we review for clear error." *Mahmood*, 820 F.3d at 192. We review the sentence's substantive reasonableness for abuse of discretion. *Gall v. United States*, 552 U.S. 38, 46–51 (2007).

Davis's 235-month sentence falls at the bottom of the 235–293 month range calculated by the district court. Relying on the Sentencing Guidelines, the court calculated Davis's total offense level as 38. Davis does not contest the 7-point increase for wire fraud nor the 1-point increase for money laundering. Rather, he challenges the findings underlying the 24-point increase, specifically: the court's "loss" determination; the 1-point increase

for mass marketing; the 2-point increase for sophisticated means; and the 2-point increase for obstruction of justice. Based on all this, Davis claims his total offense level should have been 8 and his imprisonment range 0–6 months, rendering his 235-month sentence substantively unreasonable.

We first consider Davis's complaints about the "loss" calculation. The PSR calculated the "intended loss" at $72,200,000 and the "actual loss" (the intended loss, minus amounts refunded to the VA) at $65,200,000. Davis raises four objections. First, the *gain* to Retail Ready should not be considered as the *loss* to the VA. Second, Davis improperly received no credit for services rendered to offset any loss. Third, Davis did not *intend* the loss of $72,200,000, and the 2014 misrepresentations are insufficient to prove otherwise. Fourth, no evidence of "actual loss" was presented.

Davis is mistaken for the same reason that his challenges to the restitution calculation were mistaken. Specifically, "the correct loss calculation is 'the difference between the amount the defendant actually received and the amount he would have received absent the fraud.'" *United States v. Nelson*, 732 F.3d 504, 521 (5th Cir. 2013) (quoting *United States v. Harms*, 442 F.3d 367, 380 (5th Cir. 2006)). Again, because the VA itself—and not the student-veterans—was the victim of the fraud and would not have paid anything absent Davis's misrepresentations, the correct calculation is the amount Davis actually received ($72,200,000 less the amount refunded, or $65,200,000) minus the amount he would have received ($0). *See Sharma*, 703 F.3d at 325. The district court's loss determination was correct.

We next consider the mass-marketing enhancement. Davis argues that the relevant inquiry is whether the fraud was committed *through* mass-marketing, and not whether mass-marketing occurred at the same time as the

fraud. He observes that this enhancement applies only "if the offense" "was committed through mass-marketing." U.S.S.G. § 2B1.1(b)(2). He also notes that only criminal conduct can serve as a basis for sentencing and "the 'mass marketing' allegation appears to be based on the contention that RRCC advertised online."

These arguments find no support in our caselaw. To the contrary, we have repeatedly affirmed mass-marketing enhancements in cases where, as here, the victim was a government agency and the agency's beneficiaries were the targets of a mass-marketing campaign. *E.g.*, *United States v. Mauskar*, 557 F.3d 219, 233 (5th Cir. 2009). We have rejected the argument "that a mass marketing enhancement should not apply because [the defendant's] mass marketing efforts were not directed at the victims of the crime" where the victim was a benefits program. *United States v. Isiwele*, 635 F.3d 196, 204 (5th Cir. 2011); *see also United States v. Valdez*, 726 F.3d 684, 694 (5th Cir. 2013) (noting the argument that "the enhancement does not apply where the mass-marketing is not targeted at the specific victims of the fraud" is "foreclosed by circuit precedent").

We next consider the sophisticated-means enhancement. "Sophisticated means" is defined as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1 Application Note 9(B). Davis argues that "fail[ing] to follow GAAP when submitting financial statements, chang[ing] buildings during the approval process (which was disclosed), and . . . not understand[ing] that moving business operations from one entity to another is not the same as filing a corporate name change" do not constitute "especially complex" or "especially intricate" means. This argument is premised on the idea that Davis committed mere unintentional oversights. But the district court found Davis's actions to be more akin to intentional

efforts to conceal. Davis does not explain why the district court clearly erred in these findings and so we will not disturb them.

Next, we consider the obstruction-of-justice enhancement. Davis changed the title on his house and the title on a car after it had been seized. He argues that in making these changes he did not mean to obstruct justice. Rather, he argues he changed the house title to obtain a loan and changed the car title so that the car's true owner could file a civil forfeiture claim. The district court found otherwise. The court inferred that the title changes represented an attempt to evade forfeiture—an inference supported by the timing of the title transfers, and Davis's previous contemplation of similarly deceptive transfers. Once more, Davis has not shown these findings are clearly erroneous.

Finally, Davis argues his sentence was substantively unreasonable. We disagree. We have already rejected Davis's arguments concerning his sentencing enhancements. This means that Davis was sentenced within the appropriate range—and at the bottom end, no less. We therefore find no error. *See United States v. Cooks*, 589 F.3d 173, 186 (5th Cir. 2009) ("This court applies a rebuttable presumption of reasonableness to a properly calculated, within-guidelines sentence.").

## C. Forfeiture

Finally, Davis argues the district court improperly ordered him to forfeit $72 million in "proceeds" from the wire fraud. We agree with Davis that the district court applied the wrong definition of "proceeds." *See* 18 U.S.C. § 981(a)(2). We must therefore vacate the forfeiture order and remand for further proceedings.

Under 18 U.S.C. § 981(a)(1)(C), "[a]ny property ... which constitutes or is derived from proceeds traceable" to numerous crimes,

including wire fraud, is subject to forfeiture.[7] The statute defines "proceeds" in two ways. *Id.* § 981(a)(2). If a case involves "illegal goods, illegal services, [or] unlawful activities," then "proceeds" means:

> property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense.

§ 981(a)(2)(A).[8] But if a case involves "lawful goods or lawful services that are sold or provided in an illegal manner," then "proceeds" means:

> the amount of money acquired through the illegal transactions resulting in the forfeiture, less the direct costs incurred in providing the goods or services.

§ 981(a)(2)(B). The district court applied the first definition, meaning Davis had to forfeit $72 million in tuition payments from the VA without deducting any of his costs in running Retail Ready.

On appeal, Davis argues for the second definition of "proceeds," because he provided "lawful services" (HVAC training) in an "illegal manner." § 981(a)(2)(B). That would let him subtract the "direct costs" of running Retail Ready. *Ibid.* In response, the Government argues for the first definition, emphasizing § 981(a)(2)(A) applies to "unlawful activities." Its argument is: (1) Davis's relevant conduct was not operating the school, but committing wire fraud; and (2) because wire fraud is an "unlawful activity," the first definition applies. The district court agreed with the Government,

---

[7] The Seventh Circuit has helpfully traced the byzantine statutory cross-references that link the civil forfeiture statute to the proceeds of wire fraud. *See United States v. Balsiger*, 910 F.3d 942, 956–57 (7th Cir. 2018) (citing 18 U.S.C. § 981(a)(1)(C); 18 U.S.C. § 1956(c)(7); 18 U.S.C. § 1961(1); 18 U.S.C. § 1343; 28 U.S.C. § 2461(c)).

[8] This definition of "proceeds" also applies to cases involving "telemarketing and health care fraud schemes." *Ibid.*

relying on a First Circuit case, *United States v. George*, 886 F.3d 31 (1st Cir. 2018), involving embezzlement. The defendant in *George* argued for the second definition on the theory that he provided lawful services (bus services) in an illegal manner (by embezzling funds). *Id.* at 40. Rejecting that argument, the First Circuit applied the first definition: "[George's] crime," the court reasoned, "was not the provision of bus services in an illegal manner but, rather, the misappropriation of government resources to his own behoof." *Id.* at 40.

We see at least two problems with the district court's approach. First, *George* does not support applying the first definition of "proceeds" to wire fraud. Consider a subsequent First Circuit decision, *United States v. Carpenter*, 941 F.3d 1 (1st Cir. 2019), which applied the second definition to wire-fraud proceeds. *Id.* at 3. *Carpenter* helpfully distinguished *George*:

> In [*George*], we explained that to fall under § 981(a)(2)(B), "the crime must involve a good or service that could, *hypothetically*, be provided in a lawful manner," while activities falling under § 981(a)(2)(A) are "inherently unlawful." [*George*], 886 F.3d at 40. There, we determined that the defendant's crime, embezzling funds from a federally funded organization, "[could not] be done lawfully" and so fell under § 981(a)(2)(A). *Id.* (quoting *United States v. Bodouva*, 853 F.3d 76, 80 (2d Cir. 2017)).

> By contrast, Carpenter's conviction arose out of how he solicited customers for and made misrepresentations about his [26 U.S.C.] § 1031 intermediary company. Advertising and running such a business are not "inherently unlawful" activities; rather, Benistar provided what could have been a "legal service," but which Carpenter operated in an illegal manner by misrepresenting to exchangors how their funds would be invested and investing contrary to those representations.

*Id.* at 7–8 (emphasis added). This reasoning is sound. There are some service-based crimes that can never be performed legally. One cannot lawfully make a living as a contract killer. *See also, e.g.*, *United States v. Bodouva*, 853 F.3d 76, 80 (2d Cir. 2017) ("unlawful activities" under § 981(a)(2)(A) means "inherently unlawful activities, like say the sale of foodstamps, or a robbery") (citations omitted) (cleaned up). But there are some services that, although provided illegally in one case, *could* be provided legally in another—like operating an HVAC school. *See also, e.g.*, *United States v. Nacchio*, 573 F.3d 1062, 1089 (10th Cir. 2009) (insider trading is not an "unlawful activity" under § 981(a)(2)(A) because "securities themselves generally are lawful"); *United States v. Mahaffy*, 693 F.3d 113, 138 (2d Cir. 2012) (same).

Under *Carpenter*'s reasoning, the second definition applies to Davis. There is a world where Davis legitimately operated Retail Ready while lawfully receiving tuition payments from the VA. His crime therefore involved a "service that could, hypothetically, be provided in a lawful manner" (HVAC training) but that was provided in an "illegal manner" (by fraudulently obtaining GI-Bill funds to pay students' tuition). *Carpenter*, 941 F.3d at 7 (quoting *George*, 886 F.3d at 40). By contrast, Davis's crime did not involve property derived from "inherently unlawful" activities, such as embezzlement or contract killing. *Ibid.* (quoting *George*, 886 F.3d at 40). The first definition of proceeds therefore does not apply.

Second, the district court's approach would largely wipe the second definition of proceeds out of § 981(a)(2). As the Seventh Circuit has explained, "calling . . . wire fraud 'unlawful activity'" under § 981(a)(2)(A) "risks rendering § 981(a)(2)(B) superfluous and thus meaningless." *United States v. Balsiger*, 910 F.3d 942, 957 (7th Cir. 2018); *see also Nacchio*, 573 F.3d 1088–89 (similar). All forfeitures under § 981 involve crimes. But "[i]f all unlawful conduct falls within subsection (A), it is far from clear what is left to fit within subsection (B)." *Balsiger*, 910 F.3d at 957. We should avoid a

reading that makes a statute eat itself. *See, e.g.*, *Gulf Fishermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 464–65 (5th Cir. 2020) (noting "anti-surplusage canon" under which courts should "give effect to all of a statute's provisions, so that no part will be inoperative or superfluous, void or insignificant") (citation omitted) (cleaned up). The better reading is the one adopted by several other circuits and the one we adopt here: illegally provided services that could have "hypothetically" been provided in a "legal manner"—like Davis's operation of the school—implicate the second definition of proceeds under § 981(a)(2)(B), under which a defendant may deduct "the direct costs incurred in providing the goods or services." The focus of any § 981(a)(2) analysis is the underlying criminal conduct, not the crime itself.[9]

That subsection further provides that Davis "shall have the burden of proof with respect to the issue of direct costs" and also that those costs "shall not include any part of the overhead expenses of the entity providing the goods and services, or any part of the income taxes paid by the entity." *Ibid.* The district court should have the first opportunity to consider those matters. We therefore remand for the limited purpose of determining whether Davis can prove any offset under the terms of § 981(a)(2)(B).

## VII. Conclusion

The district court's forfeiture order is VACATED and REMANDED for further proceedings consistent with this opinion. In all other respects, Davis's judgment and sentence are AFFIRMED.

---

[9] To the extent that any ambiguity remains in applying the definitions of "proceeds" in § 981(a)(2), under the rule of lenity, "the tie must go to the defendant." *United States v. Santos*, 553 U.S. 507, 514 (2008) (plurality op. of Scalia, J.); *see also United States v. Cooper*, 38 F.4th 428, 434 (5th Cir. 2022) (discussing rule of lenity).