REVISED August 24, 2023

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 26, 2023

Lyle W. Cayce
Clerk

————————

No. 22-30169

————————

United States of America,

*Plaintiff—Appellee*,

*versus*

Christopher Kinzy,

*Defendant—Appellant*.

————————————————————————

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:21-CR-102-1

————————————————————————

Before Barksdale, Southwick, and Higginson, *Circuit Judges*.[*]
Stephen A. Higginson, *Circuit Judge*:[**]

Christopher Kinzy pleaded guilty to one count of possessing a firearm after being convicted of a felony, in violation of 18 U.S.C. § 922(g)(1), and was sentenced to a term of 87 months' imprisonment. He appeals his sentence, arguing that his state conviction for resisting an officer does not qualify as a "crime of violence" under the Sentencing Guidelines, and that

———————————————

[*] Judge Barksdale concurs in the judgment only.

[**] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 22-30169

the district court lacked a reliable factual foundation for imposing a four-level enhancement for having committed the offense in connection with another felony.

Although we conclude that the district court erred in determining that Kinzy's prior conviction was a crime of violence, we nonetheless AFFIRM.

## I.

Kinzy's conviction in this case arises out of a traffic stop on January 25, 2021, in Kenner, Louisiana. According to the presentence report ("PSR"), a police officer pulled Kinzy over because the officer was unable to read Kinzy's vehicle's tinted license plate. The windows of the car were also heavily tinted. When the officer approached the vehicle, he saw a firearm near Kinzy's lap. The officer instructed Kinzy to put his hands out the window, and when the officer grabbed Kinzy's hands, Kinzy began pulling his hands inward, toward the firearm. According to the PSR, while reaching for the gun, Kinzy said, "I'm not going back to jail. I'm going to shoot you. I'll kill you." Then, "[a] struggle ensued and [officers] were able to disarm [Kinzy] and remove him from the vehicle." Then, while Kinzy was being handcuffed, he elbowed an assisting officer in the chest, causing the officer to lose his grip on Kinzy. Kinzy then pushed the officer to the ground. According to the PSR, the officer sustained "an internal injury to his upper body" requiring "immediate hospitalization and surgery for pectoralis and major muscle repair to his right shoulder."

On August 12, 2021, a grand jury indicted Kinzy on one count of possession of a firearm after being convicted of a felony, in violation of 18 U.S.C. § 922(g)(1). On December 14, 2021, Kinzy pleaded guilty without a written plea agreement.

Kinzy's PSR calculated a base offense level of 20, pursuant to U.S.S.G. § 2K2.1(a)(4)(A), because he committed the firearm offense after sustaining a felony conviction for a "crime of violence."[1] The PSR cited Kinzy's March 18, 2019, conviction for resisting police with force or violence, in violation of Louisiana Rev. Stat. § 14:108.2. The PSR also included a four-point increase in his offense level under § 2K2.1(b)(6)(B) for using or possessing a firearm in connection with another felony offense, noting that Kinzy "threatened to shoot and/or kill" the officer during the traffic stop. Kinzy received a three-point reduction for his acceptance of responsibility. Based on his total offense level of 21 and his criminal history category of VI, Kinzy's guideline range was 77 to 96 months' imprisonment.

Kinzy filed written objections to the PSR's base offense level, asserting that his prior conviction for resisting police by force or violence is not a "crime of violence." Kinzy also objected to the four-level enhancement, denying that he threatened to shoot or kill an officer and denying that he reached for the firearm. Kinzy contended that, during the traffic stop, he was "tackled by multiple officers; one of his teeth [was] knocked out and another was broken by the officers."

The Government opposed Kinzy's objections, attaching the probable-cause affidavit and a crime report in support of the four-level enhancement. The Government also asserted that Kinzy's state conviction for resisting

---

[1] The enhancement at issue also covers prior felony convictions for a "controlled substance offense." U.S.S.G. § 2K2.1(a)(4)(A). The U.S. Probation Office originally maintained that Kinzy's base offense level was 20 because of his having a prior "controlled substance offense." But the Government agreed with Kinzy's objection that his drug conviction was not a "controlled substance offense," and the PSR was revised in a supplemental addendum to reflect the "crime of violence" predicate, rather than the "controlled substance offense" predicate. The base offense level remained 20.

police with force or violence constituted a crime of violence. The Government argued that the underlying state statute is divisible and that the offense described in the subsection at issue is a crime of violence under the Sentencing Guidelines. The Government submitted the charging document from the state conviction, and the U.S. Probation Office supplemented that documentation with the transcript from Kinzy's plea hearing in state court.

At Kinzy's sentencing hearing, the district court concluded that the Louisiana statute forming the basis of Kinzy's predicate conviction was divisible and that the charging document showed that Kinzy's conviction qualified as a crime of violence. The district court also overruled Kinzy's objection to the four-level enhancement, finding that the PSR was accurate and reliable.

The district court sentenced Kinzy to 87 months of imprisonment and three years of supervised release. At the end of the hearing, the Government asked the court if it had considered the alternative guideline range suggested by Kinzy. The court responded: "The sentence that I crafted is what I believe is appropriate for the defendant in this case. It reflects the seriousness of his offense, his criminal history, and also protects the public. And I would have imposed the same sentence under either scenario to answer your question."

Kinzy timely appealed. He argues that the district court erred by assigning him a base offense level of 20 under U.S.S.G. § 2K2.1(a)(4) on the basis that he had a prior felony conviction for a "crime of violence," and by imposing a four-level enhancement under U.S.S.G. § 2K2.1(b)(6)(B) for committing the offense in connection with another felony, *i.e.*, threatening to shoot or kill the arresting officer.

## II.

We begin with the simpler of Kinzy's two challenges on appeal. Kinzy contests the district court's imposition of a four-point enhancement under U.S.S.G. § 2K2.1(b)(6)(B) for possessing a firearm in connection with another felony. Under § 2K2.1(b)(6)(B), a defendant's offense level is increased by four points if he "used or possessed any firearm or ammunition in connection with another felony offense." U.S.S.G. § 2K2.1(b)(6)(B). Kinzy's PSR recommended application of the enhancement because Kinzy "threatened to shoot and/or kill" the police officer during his arrest. Kinzy objected to the enhancement, denying that he made such a threat, and the district court overruled the objection and imposed the enhancement, finding the PSR sufficiently reliable and "supported by a proper investigation."

"In determining whether a Guidelines enhancement applies, the district court is allowed to draw reasonable inferences from the facts, and these inferences are fact findings reviewed for clear error." *United States v. Coleman*, 609 F.3d 699, 708 (5th Cir. 2010) (citing *United States v. Caldwell*, 448 F.3d 287, 290 (5th Cir. 2006)). A factual finding is not clearly erroneous "if it is plausible in light of the record as a whole." *United States v. Zuniga*, 720 F.3d 587, 590 (5th Cir. 2013) (per curiam) (citing *United States v. Rodriguez*, 630 F.3d 377, 380 (5th Cir. 2011)). A factual finding is clearly erroneous if the evidence as a whole leaves the reviewing court "with the definite and firm conviction that a mistake has been committed." *Coleman*, 609 F.3d at 708 (quoting *United States v. Cooper*, 274 F.3d 230, 238 (5th Cir. 2001)).

Kinzy disputes the facts of his offense and thus challenges the factual foundation for imposition of the enhancement.[2]  "The proponent of an adjustment to the defendant's base offense level bears the burden of establishing the factual predicate 'by a preponderance of the relevant and sufficiently reliable evidence.'"  *United States v. Aguilar-Alonzo*, 944 F.3d 544, 549 (5th Cir. 2019) (quoting *United States v. Richardson*, 781 F.3d 237, 249 (5th Cir. 2015)).  Generally, a PSR's factual recitation "bears sufficient indicia of reliability to be considered as evidence by the sentencing judge in making factual determinations."  *United States v. Harris*, 702 F.3d 226, 230 (5th Cir. 2012) (per curiam) (citation omitted).  A district court may therefore "adopt the facts contained in a PSR without further inquiry if those facts have an adequate evidentiary basis with sufficient indicia of reliability and the defendant does not present rebuttal evidence or otherwise demonstrate that the information in the PSR is unreliable."  *Id.* (cleaned up) (quoting *United States v. Trujillo*, 502 F.3d 353, 357 (5th Cir. 2007)).  To rebut facts in a PSR that are supported by adequate evidence, a defendant must submit "evidence demonstrating that those facts are 'materially untrue, inaccurate or unreliable.'"  *Id.* (quoting *United States v. Huerta*, 182 F.3d 361, 364-65 (5th Cir. 1999)).  "Mere objections are generally insufficient," but an objection "may sufficiently alert the district court to questions regarding the reliability of the evidentiary basis for the facts contained in the PSR."  *United States v. Fields*, 932 F.3d 316, 320 (5th Cir. 2019) (cleaned up) (quoting *Harris*, 702 F.3d at 230 & n.3).

Here, the PSR recommended the enhancement based on Kinzy's threat to shoot or kill the arresting officer, and Kinzy filed an objection,

---

[2] Importantly, Kinzy does not dispute that the facts, if true, support the enhancement as a matter of law.  We therefore assume without deciding that the asserted conduct satisfies the language of the enhancement.

writing through counsel that he "denies ever threatening to shoot or kill any officer." Counsel continued:

> [Kinzy] also denies reaching for the firearm at any time. To the contrary, he fully complied by stopping his vehicle, rolling his window or leaving his window rolled down, and reaching his hands out of his car window when instructed to do so. He pulled one arm back from the officer's tight grip but that was because he was attempting to get away from the firearm by opening his car door. He repeatedly asked the officers to let him open the door to get out of his vehicle. He was eventually tackled by multiple officers; one of his teeth were knocked out and another was broken by the officers. He did not intentionally injure, threaten, or attempt to injure any officer.

The U.S. Probation Office reviewed Kinzy's objection and maintained the enhancement in the final PSR, writing that "[b]ased upon the probation officer's independent investigation of the investigative material in this case, the information contained in this section of the PSR is accurate, has an indicia of reliability, and can be supported by the investigative material." The Probation Office attached the arrest report and probable-cause affidavit from the Kenner Police Department to support its finding. The affidavit states that, when the arresting officer grabbed Kinzy's hands, Kinzy "immediately began pulling his hands away from the arresting officer and pulling his hands towards the firearm in his lap in an attempt to grab it while saying 'I'm not going back to jail. I'm going to shoot you. I'll kill you.'" The affidavit is sworn to and subscribed on January 26, 2021, the day after the arrest.

After the Probation Office's rejection of defendant's challenge, the Government also responded to Kinzy's objection, arguing, along similar lines, that the facts in the PSR were supported by evidence from the Kenner Police Department, including the probable-cause affidavit describing the

No. 22-30169

event in detail. In addition to the affidavit, the Government also attached a "crime report" naming three police officers as victims of an assault on a law enforcement officer and noting that one of the officers had a "possibly torn pectoral muscle" as a result of the incident. The report identifies Christopher Kinzy as the suspect, lists three additional witnesses, and states that Kinzy "threatened to kill officer during traffic stop, with firearm." The report also contains a five-page single-spaced "narrative" attachment authored by a responding officer and time-stamped on January 30, 2021, five days after the incident. The narrative proceeds moment by moment and recounts the interaction in significant detail. The narrative says, in relevant part:

> Kinzy then placed his hands outside the window. However, immediately upon doing so, Christopher Kinzy reached his right arm down towards the handgun in his lap. Officer Lawler, fearing Christopher Kinzy was attempting to grab the handgun and discharge it at Officers, quickly grabbed Christopher Kinzy's right wrist with his left hand. Officer Lawler, with his handgun still in his right hand, then pulled Christopher Kinzy's right wrist towards the window. It was at this time, Officer Gagliano arrived to assist. Officer Gagliano positioned himself at the front driver's side window of the white Charger and observed Christopher Kinzy pull away from Officer Lawler and towards the firearm in his lap. Officer Gagliano was able to quickly gain control of Christopher Kinzy's left wrist by grabbing it with both hands.

> . . . Officer Lawler felt Christopher Kinzy stiffen his right arm. Officer Gagliano[] simultaneously began pulling Christopher Kinzy's left arm outside the window, away from the firearm. Christopher Kinzy then began aggressively pulling his arms away from Officers Lawler and Gagliano, pulling Officer Lawler and Gagliano aggressively into the side of the white Charger so strongly that the entire vehicle was swaying side to side. Officer Lawler tightened his grip on Christopher Kinzy's

wrist, and pushed off of the white Charger in order to combat Christopher Kinzy's attempts to break free and arm himself with the handgun.  When Christopher Kinzy initially reached for the handgun, and while Officers Lawler and Gagliano were attempting to restrict his wrists, Christopher Kinzy was continuously and loudly yelling "I'm not going back to jail. I'm going to shoot you. I'll kill you."

. . . During the entirety of the above described struggle, the firearm in the lap of Christopher Kinzy was in his immediate control and arm span.  Officer Lawler was also commanding Christopher Kinzy to stop resisting and to not reach for the handgun during the struggle.

Following issuance of the final PSR and submission of these evidentiary materials, Kinzy filed a sentencing memorandum, in which he again contested the facts of the arrest through counsel and "maintain[ed] that he did not threaten to shoot or kill any officer."  He pointed out that, "although the arresting officers originally charged him with aggravated assault with a firearm and battery on an officer, those charges were rejected by the state prosecutors well before the case went federal."  Kinzy also contended that the arresting officers had been sued for conduct arising out of circumstances similar to those of Kinzy's arrest.  Kinzy did not attach any evidence in support of his account of the arrest.

In light of this record evidence, Kinzy's challenge to the district court's factual finding supporting the enhancement fails.  The Government offers extensive evidence in support of the fact that Kinzy threatened to shoot or kill the officers, in the form of a sworn arrest affidavit and a detailed narrative attached to a crime report.  Kinzy, on the other hand, offers no evidence and instead rests on his unsworn assertions made through counsel. This is not sufficient to rebut the PSR's facts.  *See United States v. Rodriguez*, 602 F.3d 346, 363 (5th Cir. 2010) (finding that the PSR was not rebutted by a defendant's objections to the PSR because objections are "*not* evidence"

and are "merely 'unsworn assertions'" (emphasis in original) (citations omitted)).

Kinzy argues that he "could not provide any direct evidence to corroborate his account," "because he had none." But this is wrong. Kinzy could have at least submitted his own sworn affidavit contradicting the officers' version of the arrest. He did not do so, nor does he attempt to explain why not. *See United States v. Alfaro*, 919 F.2d 962, 966 (5th Cir. 1990) (finding no error where the defendant "did not request an evidentiary hearing on the issue, nor did he submit affidavits or other sworn testimony to rebut the evidence contained in the officer's affidavit and the presentence report"). And while Kinzy's reliance on the dropped assault charge and a lawsuit against the arresting officers may have "alert[ed] the district court to questions regarding the reliability of the evidentiary basis for the facts contained in the PSR," *Fields*, 932 F.3d at 320 (citation omitted), Kinzy does not explain why any such questions could not ultimately be resolved in favor of the facts as stated in the PSR, particularly in light of the detailed evidence submitted by the Government and the dearth of evidence offered by Kinzy. *See Alfaro*, 919 F.2d at 966 ("An affidavit prepared and submitted in support of a search warrant . . . bears sufficient indicia of reliability to be considered by the trial judge in making sentencing decisions.").

Accordingly, the record evidence supporting the facts beneath Kinzy's § 2K2.1(b)(6)(B) enhancement does not give rise to a "definite and firm conviction that a mistake has been committed." *Coleman*, 609 F.3d at 708 (citation omitted). There was therefore no clear error. We affirm the district court's imposition of the enhancement.

## III.

Kinzy also argues that his state conviction under Louisiana Rev. Stat. § 14:108.2 for resisting an officer is not a "crime of violence," and that he thus should not have received a base offense level of 20 under § 2K2.1(a)(4). This court reviews preserved challenges to the district court's interpretation and application of the Sentencing Guidelines de novo and its findings of fact for clear error. *United States v. Torres-Perez*, 777 F.3d 764, 768 (5th Cir. 2015) (citation omitted). The sentencing court's characterization of a prior offense as a "crime of violence" is a question of law subject to de novo review. *United States v. Herrera*, 647 F.3d 172, 175 (5th Cir. 2011).

## A.

Under § 2K2.1, which covers certain firearm offenses, a defendant's offense level is 20 if he "committed any part of the instant offense subsequent to sustaining one felony conviction of either a crime of violence or a controlled substance offense." U.S.S.G. § 2K2.1(a)(4)(A). The Guidelines define a "crime of violence," in relevant part, as "any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that . . . has as an element the use, attempted use, or threatened use of physical force against the person of another." U.S.S.G. § 4B1.2(a)(1).

To determine whether a predicate conviction qualifies as a "crime of violence," courts use the "categorical approach," which looks not to the conduct beneath the prior offense but instead to the statutory definitions, *i.e.*, the elements, of the statute of conviction. *Descamps v. United States*, 570 U.S. 254, 261 (2013); *United States v. Garner*, 28 F.4th 678, 681 (5th Cir. 2022) (per curiam).[3] If a statute contains "multiple, alternative versions of the

---

[3] Much of the case law governing whether prior offenses qualify as federal predicates arises in the context of the Armed Career Criminal Act ("ACCA").

No. 22-30169

crime," rather than one set of elements, it is deemed "divisible," and courts assessing such statutes instead apply a "modified categorical approach." *Descamps*, 570 U.S. at 261-62 (citation omitted).   Under the modified categorical approach, courts "determine which statutory phrase was the basis for the conviction by consulting the trial record—including charging documents, plea agreements, transcripts of plea colloquies, findings of fact and conclusions of law from a bench trial, and jury instructions and verdict forms."   *Johnson v. United States*, 559 U.S. 133, 144 (2010).   These documents are often called "*Shepard* documents," named after the Supreme Court's decision in *Shepard v. United States*, 544 U.S. 13 (2005).

The district court imposed the crime-of-violence enhancement based on Kinzy's 2019 state conviction for resisting arrest by force or violence, in violation of Louisiana Rev. Stat. § 14:108.2.  The statute provides as follows:

> A.    Resisting a police officer with force or violence is any of the following when the offender has reasonable grounds to believe the victim is a police officer who is arresting, detaining, seizing property, serving process, or is otherwise acting in the performance of his official duty:
>
> (1)    Using threatening force or violence by one sought to be arrested or detained before the arresting officer can restrain him and after notice is given that he is under arrest or detention.

---

*E.g.*, *Descamps*, 570 U.S. at 258; *Taylor v. United States*, 495 U.S. 575, 577-78 (1990). The parties agree that ACCA case law guides our analysis, despite that Kinzy's challenge arises under the Sentencing Guidelines. *Cf. United States v. Moore*, 635 F.3d 774, 776 (5th Cir. 2011) (noting that, because of "similarities" between certain Guideline provisions and ACCA, "we treat cases dealing with these provisions interchangeably" (citations omitted)); *Garner*, 28 F.4th at 682 (explaining that ACCA case law applies to a § 4B1.2(a)(1) "crime of violence" analysis because of similar statutory language).

> (2)    Using threatening force or violence toward or any resistance or opposition using force or violence to the arresting officer after the arrested party is actually placed under arrest and before he is incarcerated in jail.
>
> (3)    Injuring or attempting to injure a police officer engaged in the performance of his duties as a police officer.
>
> (4)    Using or threatening force or violence toward a police officer performing any official duty.

La. R.S. § 14:108.2(A).

Kinzy does not dispute that the statute is divisible, nor that the modified categorical approach is appropriate here. He instead contends that the Government has not shown that he was convicted under any particular subsection of the statute, thus ending the inquiry. He argues alternatively that no subsection of the statute qualifies as a crime of violence.

"The Government bears the burden of showing that, based on [the *Shepard*] documents, the offense of conviction necessarily constituted a qualifying offense under the Sentencing Guidelines." *United States v. Rodriguez-Negrete*, 772 F.3d 221, 225 (5th Cir. 2014) (citing *United States v. Castaneda*, 740 F.3d 169, 174 (5th Cir. 2013)). Where the documents do not identify the offense of conviction, the court "must consider whether the 'least culpable' means of violating the statute of conviction qualifies as an offense under the Sentencing Guidelines." *United States v. Sanchez-Rodriguez*, 830 F.3d 168, 173 (5th Cir. 2016) (per curiam) (quoting *Rodriguez-Negrete*, 772 F.3d at 225).

Here, the Government relies only on Kinzy's state-court indictment to show which subsection formed the basis of his conviction. But the indictment does not specify a subsection of the statute. It alleges, in relevant

part, that Kinzy "violated La.R.S. 14:108.2 in that he did resist a police officer . . . with the use of violence or threats of violence, knowing that said officer was acting in his official capacity." The Government argues that this language tracks only the language of subsection (4), while Kinzy argues that the language merely tracks the generic offense as described in the preamble of the statute and does not identify any particular subsection of § 14:108.2.

We agree with Kinzy. The statute's description of the generic offense provides that "[r]esisting a police officer with force or violence is any of the following when the offender has reasonable grounds to believe the victim is a police officer . . . acting in the performance of his official duty." La. R.S. § 14:108.2(A). The indictment, in turn, says that Kinzy violated § 14:108.2 by "resist[ing] a police officer . . . with the use of violence or threats of violence, knowing that said officer was acting in his official capacity." The resemblance is close. The only word that substantively distinguishes the indictment's language from the generic offense in the statute is the indictment's use of the word "threats," which does not appear in the generic-offense definition. But the word "threats" does not clarify which subsection formed the basis of Kinzy's conviction, because three of the four subsections use the word "threatening." *See id.* § 14:108.2(A)(1), (2), (4) (referring to "threatening force or violence"). We are thus unpersuaded by the Government's contention that the word "threats" in the indictment is meant to refer exclusively to subsection (4), as opposed to any of the three subsections using that word.

Moreover, it is true that subsection (4), unlike (1) and (2), refers to "a police officer performing any official duty," which sounds like the indictment's language. But this language also shows up in the generic-offense description. *See id.* § 14:108.2(A). Indeed, the indictment's language resembles the generic offense *more* than subsection (4) in this regard: the indictment refers to Kinzy's "*knowing* that said officer was acting in his

official capacity," thus satisfying the generic offense's requirement that the offender have "*reasonable grounds to believe* the victim is a police officer . . . acting in the performance of his official duty." *Id.* (emphasis added). Subsection (4), on the other hand, refers to "force or violence *toward* a police officer performing any official duty." *Id.* § 14:108.2(A)(4) (emphasis added). The indictment contains no such language.

Because the indictment fails to specify a subsection of conviction, and because its sparse language closely resembles the statute's description of the generic offense, we cannot say with any degree of certainty that Kinzy was convicted under subsection (4) of § 14:108.2(A).

In support of its argument that Kinzy's indictment corresponds only to subsection (4), the Government cites this court's decisions in *United States v. Sanchez-Espinal*, 762 F.3d 425, 430 (5th Cir. 2014), and *United States v. Torres-Jaime*, 821 F.3d 577, 580-51 (5th Cir. 2016). But, far from supporting the Government's position here, those cases further illustrate why Kinzy's indictment fails to identify a subsection of conviction. In those cases, the charging documents' language tracked the statutory language much more clearly and unambiguously than the unsatisfying comparison urged here. For example, in *Sanchez-Espinal*, the charging document included the lengthy phrase, "in violation of a duly served order of protection, or such order of which the defendant had actual knowledge because the defendant was present in court when such order was issued." 762 F.3d at 430. The New York statute at issue had three subsections, one of which contained this language essentially verbatim, while the other two subsections contained no language of the sort. *See* N.Y. Penal Law § 215.52. Similarly, in *Torres-Jaime*, the court considered a state-court aggravated-assault charge in which the indictment alleged that the defendant "did unlawfully make an assault upon [the victims], with his 2000 Chevrolet Express Van, an instrument which when used offensively against a person is

likely to result in serious bodily injury." 821 F.3d at 580-81. Georgia's aggravated-assault statute contains three subsections, one of which covers assaults "[w]ith a deadly weapon or with any object, device, or instrument which, when used offensively against a person, is likely to or actually does result in serious bodily injury." Ga. Code Ann. § 16-5-21(a)(2). The other subsections contained no comparable language, and the court found that the defendant's indictment "unquestionably track[ed]" subsection (2). *Torres-Jaime*, 821 F.3d at 581. What's more, the statutes at issue in *Sanchez-Espinal* and *Torres-Jaime* did not contain subsections that at all resembled the generic offense or any preamble language.

The Government has therefore not carried its burden to show which subsection formed the basis of Kinzy's predicate state conviction. Accordingly, we must ask if the "'least culpable' means of violating the statute of conviction qualifies as an offense under the Sentencing Guidelines." *Sanchez-Rodriguez*, 830 F.3d at 173 (citation omitted). As the Government concedes, the statute fails this test. For instance, subsection (1) accommodates a conviction for "[u]sing threatening force or violence by one sought to be arrested or detained before the arresting officer can restrain him and after notice is given that he is under arrest or detention." La. R.S. § 14:108.2(A)(1). This does not "ha[ve] as an element the use, attempted use, or threatened use of physical force *against the person of another*." U.S.S.G. § 4B1.2(a)(1) (emphasis added). Furthermore, subsection (3) accommodates a conviction merely for injuring an officer, La. R.S. § 14:108.2(A)(3). This does not satisfy § 4B1.2(a)(1). *See Leocal v. Ashcroft*, 543 U.S. 1, 7-10 (2004) (holding that a Florida felony that requires "causing serious bodily injury" does not satisfy a substantially similar "crime of violence" definition because it includes "negligent or merely accidental conduct").

Because the indictment fails to identify a particular subsection as the basis of Kinzy's conviction, and because the least culpable means of violating the statute does not qualify as a "crime of violence" as defined in U.S.S.G. § 4B1.2(a)(1), the district court's imposition of the crime-of-violence enhancement was an error.

**B.**

But our inquiry does not end here. The Government contends that any error in the guideline calculation was harmless. Kinzy disagrees. Under our harmless-error doctrine, the Government is right.

Challenges to guideline calculations are subject to harmless-error review. *United States v. Greer*, 20 F.4th 1071, 1073 (5th Cir. 2021). In the Fifth Circuit, "there are two ways to show harmless error if the wrong guidelines range is employed." *United States v. Guzman-Rendon*, 864 F.3d 409, 411 (5th Cir. 2017) (citing *United States v. Richardson*, 676 F.3d 491, 511 (5th Cir. 2012)). The first is "to show that the district court considered both ranges (the one now found incorrect and the one now deemed correct) and explained that it would give the same sentence either way." *Id.* The second "applies even if the correct guidelines range was not considered." *Id.* Under this method, the government must "convincingly demonstrate both (1) that the district court would have imposed the same sentence had it not made the error, and (2) that it would have done so for the same reasons it gave at the prior sentencing." *Id.* (cleaned up) (quoting *United States v. Ibarra-Luna*, 628 F.3d 712, 714 (5th Cir. 2010)).

Kinzy asks us to apply the latter standard from *Ibarra-Luna*, which demands a higher showing from the Government. As a threshold matter, Kinzy contends that the "two paths" to showing harmless error "are not independent tests," and are instead "two alternative means for the government to meet its 'heavy burden' of 'proving that the sentence the

district court imposed was not influenced *in any way* by the erroneous Guidelines calculation." To this end, Kinzy cites *Ibarra-Luna*'s statement that the harmless-error doctrine applies "only" if the Government meets this heavy burden.[4] 628 F.3d at 714. But this court has already rejected this argument based on our rule of orderliness. In *Guzman-Rendon*, we explained that, notwithstanding *Ibarra-Luna*'s use of the word "only," the *Ibarra-Luna* method is not the only way to show harmless error in a guideline-range calculation. The court explained as follows:

> *Ibarra-Luna* contains some language suggesting that it represents the exclusive manner for examining harmless error in this circuit. Specifically, it suggests that the "harmless error doctrine applies *only*" if the procedure described above is followed. *Richardson*[5] postdates *Ibarra-Luna*, so if *Ibarra-Luna*'s claims of exclusivity were correct, *Richardson* might not be valid precedent under this circuit's rule of orderliness, which prohibits one panel from overruling another panel absent intervening *en banc* or Supreme Court decisions. However, *Ibarra-Luna* in turn postdates two cases, *United States v. Duhon*, 541 F.3d 391 (5th Cir. 2008) and *United States v.*

---

[4] Even where Kinzy refrains from urging the *Ibarra-Luna* test directly, he bases his harmless-error arguments on cases that apply the *Ibarra-Luna* standard. *E.g., United States v. Alfaro*, 30 F.4th 514, 521 (5th Cir. 2022) (applying the *Ibarra-Luna* standard); *United States v. Martinez-Romero*, 817 F.3d 917, 924-25 (5th Cir. 2016) (same); *United States v. Tanksley*, 848 F.3d 347, 353 (5th Cir.), *supplemented*, 854 F.3d 284 (5th Cir. 2017); *see Tanksley*, 854 F.3d at 286 n.1 (noting that the panel opinion's "harmless error analysis relied exclusively on the test set forth in [*Ibarra-Luna*], because the district court did not consider the correct guidelines range").

[5] *Richardson* articulates both methods of showing harmless error, 676 F.3d at 511, and in this way contradicts the proposition that the *Ibarra-Luna* method is the "only" means of showing harmless error.

> *Bonilla*, 524 F.3d 647 (5th Cir. 2008),[6] which draw the same distinction *Richardson* does, and thus, to the extent *Ibarra-Luna* claimed exclusivity, that claim would be foreclosed by the rule of orderliness.

*Guzman-Rendon*, 864 F.3d at 411 n.1 (cleaned up) (emphasis in original) (internal citations omitted).

We therefore reject Kinzy's argument that the harmless-error inquiry consists exclusively of the test articulated in *Ibarra-Luna*. There are, as explained in *Guzman-Rendon*, "two ways to show harmless error if the wrong guidelines range is employed." *Id.* at 411; *see also Richardson*, 676 F.3d at 511.

Having so concluded, we must decide whether the district court's error here was harmless under either of these tests. The Government contends that the requirements of *Bonilla* and *Duhon* are satisfied, because the district court (1) considered the correct range and (2) stated that it would impose the same sentence either way.[7] Kinzy argues that the Government fails to satisfy *Bonilla* and *Duhon* because the record here shows that the district court did not actually consider the alternative guideline range.[8] The result, if Kinzy were right, would be to apply the demanding *Ibarra-Luna* standard. *See United States v. Juarez*, 866 F.3d 622, 633 (5th Cir. 2017)

---

[6] *Bonilla* was overruled on other grounds—not implicating its harmless-error analysis—by our en banc decision in *United States v. Reyes-Contreras*, 910 F.3d 169, 177-78, 187 (5th Cir. 2018).

[7] The Government states that it "does not pursue" the *Ibarra-Luna* method.

[8] Kinzy did not make this argument in his briefs; counsel raised it for the first time at oral argument. We generally do not consider arguments raised for the first time at oral argument. *United States v. Robinson*, 67 F.4th 742, 752 n.3 (5th Cir. 2023) (citation omitted). We address the argument here only to explain why it is unavailing in any event.

(explaining that the *Ibarra-Luna* test governs situations "when a court does not consider the proper sentencing range" (quoting *United States v. Martinez-Romero*, 817 F.3d 917, 924 (5th Cir. 2016)).

But Kinzy's argument fails under our case law, which, for the purposes of the *Bonilla-Duhon* harmlessness test, requires only that the district court "entertain[] arguments as to the proper guidelines range." *United States v. Nanda*, 867 F.3d 522, 531 (5th Cir. 2017) (citations omitted). For example, in *Duhon*, we explained that "the district court was aware of the correct Guideline range because it was in the PSR, and the Government had vehemently argued for the [contested] enhancements during the sentencing proceeding." 541 F.3d at 396. Similarly, in *Bonilla*, we explained that, "[a]lthough the district court did not comment on the guideline ranges that would apply with and without the enhancement, the record reflect[ed] no disagreement between the parties or confusion by the district court about the guidelines range before and after the enhancement." 524 F.3d at 656. There, the defendant had argued in his objections to the PSR that "he should be scored at Level 6, at a Category I, with a sentencing range of 0-6 months," and, at sentencing, the district court "specifically referenced his consideration of the parties' arguments made at sentencing and in the reports before" imposing the defendant's sentence. *Id.* at 656-57; *see also United States v. Medel-Guadalupe*, 987 F.3d 424, 429 (5th Cir. 2021) (finding the *Bonilla-Duhon* requirements satisfied where "the district court was aware of the guidelines range absent the enhancements because Medel-Guadalupe advised the court of this range in his written PSR objections").

Guided by these principles, we conclude that the district court here did "consider" the proper range, *i.e.*, the range that would apply absent the erroneous crime-of-violence finding, because that range featured prominently in the parties' written sentencing materials and at the sentencing hearing. Specifically, Kinzy filed written objections to the PSR's

use of a base offense level of 20, arguing that his state conviction was not a crime of violence under § 2K2.1(a). He accordingly contended that his proper base offense level was 14. (This reflects a six-point decrease from the PSR's offense level, and, after Kinzy's other adjustments, would have resulted in a sentencing range of 41 to 51 months. *See* U.S.S.G. ch. 5, pt. A (sentencing table)). Kinzy also filed a sentencing memorandum, arguing that the crime-of-violence enhancement increased his guideline range "from 41-51 months to 77-96 months." He requested a sentence of 51 months, which he acknowledged was at the top of the lower guideline range for which he advocated. The Government argued in its sentencing memorandum for the 77-to-96-month range, and further requested, "should the Court sustain defendant's objection regarding his prior conviction for a crime of violence," that it impose "an upward variance to the same range, 77 to 96 months."

At Kinzy's sentencing hearing, the district court explicitly stated that it had "read the defendant's [sentencing] memorandum and the responses of the United States Probation Office and also of the Government." It then proceeded through Kinzy's objections, including his objection to the crime-of-violence enhancement. The court stated, "as for the objection to [the crime-of-violence enhancement,] . . . [a]fter reviewing the defendant's objection and the government's response, I find that the final PSR does properly evaluate the United States Sentencing Guidelines Section 2K2.1(a)(4)." The court then overruled the objection and used a base offense level of 20 because it found that the crime-of-violence enhancement under § 2K2.1(a)(4) was appropriate.

Then, after announcing that the guideline range of imprisonment was therefore 77 to 96 months, the court again mentioned Kinzy's sentencing memorandum and invited Kinzy and the attorneys to speak before the imposition of sentence. Kinzy's counsel reminded the court: "[I]n our sealed memorandum, we asked the Court to consider a sentence of 51 months,

which would have been the top of the guidelines had the Court sustained the objection to the crime of violence." Counsel then asked the court "when fashioning [Kinzy's] sentence . . . not to sentence him . . . within the 77 to 96 range, because under the equitable circumstances of the prior [offense], it's not . . . the type of crime of violence which commands a severe punishment." After arguing a series of mitigating factors, Kinzy's counsel again "ask[ed] the Court to sentence him to a sentence of 51 months in prison." The Government responded by reminding the court of its sentencing memorandum and again "requesting a within guideline sentence between 77 and 91 . . . months."[9] The court then imposed an 87-month sentence. Under our precedents, this is more than enough to demonstrate that the district court considered the proper guideline range.

At oral argument, Kinzy argued against this conclusion by pointing to our decision in *United States v. Sanchez-Arvizu*, 893 F.3d 312 (5th Cir. 2018) (per curiam).[10] There, the court held that it could not "conclude that the district court considered and rejected the correct Guidelines range," even though the range deemed correct on appeal—15 to 21 months—was mentioned at the sentencing hearing. *Id.* at 316-17. But Kinzy's reliance on *Sanchez-Arvizu* is misplaced for at least two reasons.

First, *Sanchez-Arvizu* did not involve a district court's statement that it would impose the same sentence in the event of a guideline-calculation error. Accordingly, the court in *Sanchez-Arvizu* did not have occasion to

_____

[9] The top of the range is 96, not 91. The Government appears to have misspoken.

[10] Kinzy cited *Sanchez-Arvizu* for the first time in his reply brief, and even then, he did not cite it for the proposition later urged at oral argument. Again, we generally do not consider arguments raised for the first time at oral argument and address the issue here solely for the sake of thoroughness.

consider the issue presented by Kinzy's appeal—namely, whether, under the *Bonilla-Duhon* harmlessness standard, the district court "considered" the proper guideline range, such that its articulation of an alternative basis for the same sentence was sufficient to render any error harmless. That distinction alone is enough to reject Kinzy's comparison to the case.

But even assuming that the case is instructive for the *Bonilla-Duhon* issue presented here, the case is materially distinct on its facts. In *Sanchez-Arvizu*, there was considerably less evidence that the district court considered the correct sentencing range. Specifically, defense counsel in *Sanchez-Arvizu* did not object to the probation officer's calculation of the higher range, so the lower, correct range was not included in the defendant's written sentencing materials. *Id.* at 314. And the lower range was mentioned only once at the sentencing hearing, when defense counsel stated (incorrectly) that under a proposed amendment to the Guidelines, the defendant's range would be 15 to 21 months. *Id.* at 316. The probation officer calculated an even lower range—one to seven months—and the exchange with the court "centered on" that estimation. *Id.* Notably, the district court stated that any amended range would not be retroactive and that it was "not inclined to follow it." *Id.* (internal quotation marks omitted). This passing reference to a hypothetical lower range under a proposed amendment is a far cry from Kinzy's repeated pressing of the relevant range in both written and oral submissions to the sentencing court.

For these reasons, *Sanchez-Arvizu* does not undermine our conclusion that, based on this record, under the relevant case law, the district court here "considered" the proper guideline range. *Guzman-Rendon*, 864 F.3d at 411 (citation omitted).

The only remaining question, then, is whether the district court "explained that it would give the same sentence either way." *Id.*; *see also*

*Nanda*, 867 F.3d at 531 ("[W]hen a district court entertains arguments as to the proper guidelines range and explicitly states that it would have given the same sentence it did regardless, any error in the range calculation is harmless." (citations omitted)).

Here, the court made the requisite statement. At the end of the hearing, the Government asked the court if it had "considered the alternative guideline suggested by the defendant." The court responded: "The sentence that I crafted is what I believe is appropriate for the defendant in this case. It reflects the seriousness of his offense, his criminal history, and also protects the public. And I would have imposed the same sentence under either scenario to answer your question."

This case thus falls in the camp of situations in which "the district court considered both ranges" and "explained that it would give the same sentence either way." *Guzman-Rendon*, 864 F.3d at 411. Accordingly, the district court's error in applying the § 2K2.1(a)(4) crime-of-violence enhancement was harmless. *See Nanda*, 867 F.3d at 531; *Richardson*, 676 F.3d at 512; *Duhon*, 541 F.3d at 396; *Bonilla*, 524 F.3d at 656-57.

On this basis, we affirm Kinzy's sentence despite the error.

## C.

This case pushes the outer bounds of our harmless-error doctrine. Christopher Kinzy was sentenced to a term of imprisonment that exceeds the top of his correct sentencing range by three years. The sentence imposed is nearly double the length of the midpoint of his correct range. And the sentence imposed sits at the very center of a range whose calculation rests on a legal error. But, bound by our case law, we are compelled to conclude that the sentence must stand.

To be sure, the *Bonilla-Duhon* rule has a degree of merit. In some cases, the rule simply gives effect to the commonsense proposition that "[n]ot all errors in determining a defendant's guideline sentence require reversal." *Bonilla*, 524 F.3d at 656. The rule reflects the post-*Booker* reality that the Sentencing Guidelines are just the starting point for a district court and that, ultimately, sentences are to be individualized based on the circumstances of a particular defendant in a particular case. *See Molina-Martinez v. United States*, 578 U.S. 189, 200 (2016) (explaining that, while "[t]he Guidelines inform and instruct the district court's determination of an appropriate sentence," the "sentencing process is particular to each defendant," and, "[t]he record in a case may show, for example, that the district court thought the sentence it chose was appropriate irrespective of the Guidelines range").

Moreover, the *Bonilla-Duhon* rule does not exclusively favor the Government's defense of higher sentences imposed after the erroneous application of sentencing enhancements. The rule applies equally to *lenient* sentences that follow the erroneous *non*-imposition of enhancements. *Duhon* itself was such a case. There, the Government appealed the district court's downward variance to a sentence of sixty months' probation in part on the basis that the district court failed to impose certain sentencing enhancements supported by facts in the PSR. 541 F.3d at 395-96. We concluded that, although the court "ultimately erred by failing to apply the enhancements," the error was not reversible because the court was aware of the correct guideline range and "declared that it would have sentenced Duhon to sixty months of probation even if it miscalculated the . . . range." *Id.* at 396.

Understood as a doctrine that is compelled by the discretionary nature of sentencing and is balanced in its applicability, the *Bonilla-Duhon* rule may be both reasonable and fair. But in this case, we confess that its application unsettles us. A more probing review of the record reveals why.

No. 22-30169

It was under odd circumstances that the district court made its final statement that it would impose the same sentence "under either scenario." The court had already ruled on Kinzy's objections, announced its guideline-range calculations, heard Kinzy's allocution and other arguments from the parties, imposed sentence, advised Kinzy of his appellate rights, and ordered that Kinzy be remanded to the custody of the U.S. Marshals. Then, the court attempted to adjourn the hearing. When the court said, "If there's nothing further," the Government interjected. Counsel said, in relevant part:

> I would ask your Honor, in light of the fact there's no waiver of appeal in this case, I would ask whether your Honor has considered the alternative guidelines range suggested by the defendant and whether you would have imposed the same sentence had that alternative guideline range been in effect. If your Honor has considered that.

The court did not engage the Government's request. It said, "Will you submit this in writing, please, submit this in [a] post sentencing brief." Defense counsel spoke up, and the exchange continued as follows:

> [DEFENSE]: Your Honor, it sounds that the Court hasn't made the decision to impose the sentence regardless, and we just ask that the sentence remain as is, that it not be extended further, he's ready to begin his term, you know. We're ready to conclude this matter. I don't think there needs to be a further—
>
> THE COURT: What are you requesting, Mr. [prosecutor]?
>
> [GOVERNMENT]: So, your Honor, I guess if your Honor has considered the alternative guideline suggested by the defendant and then would have imposed the same sentence anyway, then should this case be appealed and the Fifth Circuit find that the Court committed error with respect to the guidelines calculations, that error would arguably be harmless error since you would have imposed the same sentence.

26

No. 22-30169

THE COURT: The sentence that I crafted is what I believe is appropriate for the defendant in this case. It reflects the seriousness of his offense, his criminal history, and also protects the public. And I would have imposed the same sentence under either scenario to answer your question.

[GOVERNMENT]: Thank you, your Honor.

THE COURT: Court's adjourned.

[DEFENSE]: Please note our objection for the record. Thank you.

We emphasize three salient features of this sentencing record that give us pause in applying our *Bonilla-Duhon* harmlessness rule. First, the district court's statement was made as an afterthought, at the very end of the sentencing hearing, after imposition of the sentence. The court did not issue the statement when one might expect it—namely, in imposing the term of imprisonment and articulating its reasons for doing so.

Second, the statement was made only at the Government's repeated request.[11] Not only was the court evidently not inclined to make the statement on its own volition, but it indeed appeared confused when the Government raised it. The court first rebuffed the Government by telling it to file a written motion. It then had to ask counsel, "What are you requesting . . . ?" Most concerning, the Government's request was an acknowledged attempt to insulate the sentence on appeal. The Government

---

[11] We observe that this practice is apparently not new. In at least one other *Bonilla-Duhon* case, from over a decade ago, the court made its statement at the invitation of the Government. *See Richardson*, 676 F.3d at 510 ("After the district court finished announcing its sentence, the Government asked the court whether it would state on the record that it would have imposed the same sentence, notwithstanding the enhancements that had been applied to Richardson's offense level.").

said as much, telling the court that its request was "in light of the fact [that] there's no waiver of appeal in this case," and explaining that, "should this case be appealed and the Fifth Circuit find that the Court committed error with respect to the guidelines calculations, that error would arguably be harmless error since you would have imposed the same sentence."[12]

Third and finally, the court's statement of reasons for the alternative sentence was perfunctory. The court said that the same sentence would have resulted "under either scenario," without explaining why, if Kinzy's conviction were *not* a crime of violence, the court would have decided to vary upward by three years, nearly doubling the guideline range, and why it would have landed at the center of the heightened (and wrong) range.

These troubling aspects of the record, however, cannot alter our resolution. Our *Bonilla-Duhon* jurisprudence, as it stands, does not interrogate record-based oddities like these, much less instruct that the harmlessness of a sentencing error turns on factors like when the district court's statement was made or whether it came at the Government's urging. Nor has our case law required that district courts offer a more detailed explanation of the alternative sentence.[13] To turn these disconcerting

---

[12] The Government made the same argument in its written submission before sentencing. In its response to Kinzy's PSR objections, the Government wrote in a footnote:

> The government also notes that any error in calculating the guidelines related to the crime-of-violence enhancement would be subjected to harmless error review on appeal, so long as the Court contemplated the guidelines range suggested by defendant and "stated that it would have imposed the same sentence even if that range applied."

[13] At least two sister circuits require more than a simple statement that the court would have imposed the same sentence in the event of a guideline-calculation error. For example, while the Third Circuit, like us, acknowledges that an error in

No. 22-30169

features of the record into case-dispositive facts would be to create new carveouts from our *Bonilla-Duhon* doctrine. In an appropriate case, it may be prudent to do so, but Kinzy has not, at least to this panel, asked that we take such a step.[14]

---

a guideline-range calculation can be harmless if the district court "explicitly states that it would have imposed the same sentence even under the correct Guidelines range," *United States v. Raia*, 993 F.3d 185, 195 (3d Cir. 2021), the court scrutinizes those statements and requires that alternative sentences be fully explained. *See id.* at 196 ("[E]ven an explicit statement that the same sentence would be imposed under a different Guidelines range is insufficient if that alternative sentence is not also a product of the entire three-step sentencing process."); *see also United States v. Wright*, 642 F.3d 148, 154 n.6 (3d Cir. 2011) (remanding for resentencing where the district court said it would have imposed the same sentence even without an enhancement, but "without explaining what the Guidelines range would have been without the enhancement, and without explaining why an upward departure or variance would be merited from that range").

The Tenth Circuit also demands more than we do. In *United States v. Pena-Hermosillo*, the Tenth Circuit remanded for resentencing despite that the "district court found that the same sentence would be appropriate . . . even if the correct offense level were five points higher and the recommended guidelines range 136 months higher," explaining that "[s]urely that requires some explanation beyond a vague statement that the sentence is appropriate under § 3553(a)." 522 F.3d 1108, 1117 (10th Cir. 2008) (McConnell, J.). The court noted that it is "hard" to "imagine a case where it would be procedurally reasonable for a district court to announce that the same sentence would apply even if correct guidelines calculations are so substantially different, without cogent explanation." *Id.*

[14] Instead, Kinzy has based his opposition to the Government's harmlessness position on the assertion that we should apply the *Ibarra-Luna* standard because (i) *Bonilla-Duhon* is not an "independent test," and, alternatively, (ii) the district court did not sufficiently "consider" the correct range. For the reasons given *supra* Section III.B, these arguments are foreclosed by our case law.

As to that law, we note that the *Bonilla-Duhon* rule appears best suited for scenarios where the district court imposes a *non*-guidelines sentence. Indeed, this was the situation in both *Bonilla* and *Duhon*. *See* 524 F.3d at 656; 541 F.3d at 394-96. But the rule has since been expanded to cover situations like Kinzy's, where

No. 22-30169

For now, we simply warn that the workability and fairness of our harmless-error doctrine depend fundamentally on the good faith of the Government, defense counsel, and the district courts. The doctrine is meant to reflect the reality that the Sentencing Guidelines are advisory and that not all errors arising from the complex process of calculating guideline ranges require reversal and resentencing. The doctrine is not to be deployed as a talisman to insulate sentences that otherwise ought to be revisited by all participants: opposing counsel, the parties, and sentencing judges.

## IV.

Kinzy's prior state conviction does not categorically qualify as a crime of violence, and the district court's conclusion to the contrary was erroneous. But our harmless-error doctrine compels us to hold that the sentence must stand. We accordingly AFFIRM the judgment of the district court.

_____

the imposed sentence is within a different—and purportedly incorrect—guideline range. *See, e.g.*, *Guzman-Rendon*, 864 F.3d at 410-12.